322 F.3d 635
 EIE GUAM CORPORATION, a Guam corporation, Plaintiff-Appellant,
v.
The LONG TERM CREDIT BANK OF JAPAN, LTD., now known as the Shinsei Bank, Ltd., a Japanese corporation; and the Resolution and Collection Corporation, a Japanese corporation, Defendants-Appellees.
EIE Guam Corporation, a Guam corporation, Plaintiff-Appellee,
v.
The Long Term Credit Bank of Japan, Ltd., now known as The Shinsei Bank, Ltd., a Japanese corporation; and the Resolution and Collection Corporation, a Japanese corporation, Defendants-Appellants.
 No. 02-16214.
 No. 02-16259.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 13, 2003.
 Filed February 27, 2003.
 
 COPYRIGHT MATERIAL OMITTED Seth M. Hufstedler and Shirley M. Hufstedler, Morrison & Foerster LLP, Los Angeles, CA, for the appellant-cross-appellee.
 John E. Porter, Paul, Hastings, Janofsky & Walker LLP, Los Angeles, CA, for the appellees-cross-appellants.
 Appeals from the District Court of Guam; Edward Rafeedie, District Judge, Presiding. D.C. No. CV-00-00009-ER.
 Before: HUG, ALARCÓN, and GRABER, Circuit Judges.
 OPINION
 GRABER, Circuit Judge.
 
 
 1
 We are called on to decide whether a voluntarily joined foreign sovereign may remove a case from a territorial court to a federal district court when the foreign sovereign obtained the original defendant's interest by assignment after the commencement of the litigation. We answer that question "yes" and, accordingly, affirm the district court's exercise of jurisdiction over this case.
 
 FACTUAL AND PROCEDURAL HISTORY
 
 2
 EIE Guam Corporation ("EIEG") is a Guam corporation that is a wholly owned subsidiary of a Japanese corporation, EIE International, Inc. In July of 1992, EIEG obtained a loan of $110.3 million from the Long Term Credit Bank of Japan ("Bank") for the construction of the Hyatt Regency Guam Hotel ("Hotel"). In exchange, EIEG executed a construction loan agreement, note, and mortgage on the Hotel. The mortgage allowed the Bank to foreclose on the Hotel if EIEG defaulted on the loan.
 
 
 3
 EIEG defaulted on the loan in 1993. The loan was extended for one year, but then fell back into default. A Forbearance Agreement was executed by the parties, but collapsed. EIEG has made no payment to the Bank since 1995.
 
 
 4
 Facing possible foreclosure, EIEG filed suit against the Bank and the other lenders in Guam Superior Court in August 1995. The Bank counterclaimed. The other lenders were dismissed by stipulation. In June 1999, the Guam Superior Court enjoined the Bank from foreclosing on the Hotel.
 
 
 5
 In August of 1999, the Bank assigned to the Resolution and Collection Corporation ("RCC"), a Japanese corporation, its notes, security instruments, and claims in the litigation with EIEG. In January 2000, the Bank moved to join the RCC as a defendant and counterclaimant under Guam Rule of Civil Procedure 25(c).[1] Two months later, EIEG stipulated to the RCC's voluntary joinder. The court filed a joinder order. The RCC then immediately removed the entire action to federal district court under the provisions of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1601-1611.
 
 
 6
 Thereafter, the parties engaged in mediation on the island of Maui, Hawaii. At the end of the mediation session, and just six days before the trial in federal district court was scheduled to begin, the parties executed a document they called the "Maui Term Sheet," settling the present litigation and agreeing to dismiss a related action.
 
 
 7
 In an attempt to iron out their remaining differences, the parties engaged in further negotiations. Those negotiations proved fruitless, however, and the parties reached an impasse. The parties then filed motions in federal district court, asking the court to interpret and enforce the Maui Term Sheet. The court filed an order in July 2001, interpreting and enforcing the Maui Term Sheet. That order held that the Maui Term Sheet constituted an enforceable settlement agreement. Additionally, it interpreted several of the provisions of the agreement whose meaning the parties disputed, and required that the parties conform to those interpretations.
 
 
 8
 The parties nonetheless failed to agree on the forms of the releases to be executed between them and, therefore, failed to close the deal by the August 9, 2001, deadline provided in the Maui Term Sheet. The Bank and the RCC asked the district court to schedule the case for trial, claiming that this was the remedy called for in the Maui Term Sheet. EIEG countered with a motion to enforce the settlement, maintaining that the court should order specific performance of the agreement. In two orders issued in May of 2002, the district court held that it had the power to enforce the settlement agreement summarily. It interpreted the disputed provisions and ordered the parties "to do everything in their power to implement the settlement." The district court set a new closing date of November 25, 2002. Instead of working to close the deal by that date, the parties brought these timely appeals of the district court's two May 2002 orders.[2]
 
 STANDARDS OF REVIEW
 
 9
 The existence of subject matter jurisdiction under the FSIA is a question of law that we review de novo. Park v. Shin, 313 F.3d 1138, 1141 (9th Cir.2002). We review a district court's findings of fact for clear error. Freeman v. Allstate Life Ins. Co., 253 F.3d 533, 536 (9th Cir.2001).
 
 DISCUSSION
 
 10
 EIEG presents four arguments to support its assertion that removal of the case to federal court was improper. EIEG argues that: (A) the RCC is not a "foreign state" within the meaning of the FSIA; (B) the action is not "against" the Bank and the RCC, so the FSIA's removal provision does not apply; (C) the RCC could not remove because it is an assignee that took the assignment after the litigation was underway, and then voluntarily joined the litigation; and (D) the RCC submitted itself to the jurisdiction of the Guam Superior Court. We will address each of those arguments in turn.
 
 
 11
 A. The RCC Is a Foreign State Under the FSIA.
 
 
 12
 The Foreign Sovereign Immunities Act provides the exclusive source of subject matter jurisdiction over suits involving foreign states and their instrumentalities. Gates v. Victor Fine Foods, 54 F.3d 1457, 1459 (9th Cir.1995); Joseph v. Office of Consulate Gen. of Nig., 830 F.2d 1018, 1021 (9th Cir.1987). The FSIA grants federal courts subject matter jurisdiction over actions brought against "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). "An `agency or instrumentality of a foreign state' means any entity"
 
 
 13
 (1) which is a separate legal person, corporate or otherwise, and
 
 
 14
 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 
 
 15
 (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.
 
 
 16
 28 U.S.C. § 1603(b).
 
 
 17
 The parties, and we, agree that the RCC satisfies the requirements of § 1603(b)(1) and (b)(3). The only point of dispute is whether the RCC satisfies one of the alternative conditions of § 1603(b)(2). "[T]here are two ways in which an entity can fulfill the requirements of § 1603(b)(2). Either the entity can be an `organ of a foreign state,' or the entity can have a majority of its shares or other ownership interest owned by `a foreign state or a political subdivision thereof.'" Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect, 89 F.3d 650, 654 (9th Cir.1996) (quoting Gates, 54 F.3d at 1461). In this case, the first condition is met, so we need not consider the second.[3]
 
 
 18
 We have observed that "[the FSIA]'s legislative history suggests that Congress intended the terms `organ' and `agency or instrumentality' to be read broadly." Gates 54 F.3d at 1460. For example, the House Report stated that
 
 
 19
 entities which meet the definition of an "agency or instrumentality of a foreign state" could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.
 
 
 20
 H.R. Rep. No. 94-1487, at 15-16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614. We have also explained:
 
 
 21
 In defining whether an entity is an organ, courts consider whether the entity engages in a public activity on behalf of the foreign government. In making this determination, courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law.
 
 
 22
 Patrickson v. Dole Food Co., 251 F.3d 795, 807 (9th Cir.2001), cert. granted in part, 536 U.S. 956, 122 S.Ct. 2657, 153 L.Ed.2d 834 (2002) (citing Corporacion Mexicana, 89 F.3d at 654-55; Gates, 54 F.3d at 1461). An entity may be an organ of a foreign state even if it has some autonomy from the foreign government. Patrickson 251 F.3d at 808; see also Gates 54 F.3d at 1461 (stating that because "the [state] is not directly involved in the day-to-day activities of [the entity] does not mean that it is not exercising control over the entity").
 
 
 23
 The Japanese government created the RCC expressly to perform a public function. The district court found that the RCC was created pursuant to several laws enacted by the Japanese Diet, namely Article 3.1 of Tokeutei Jutaku Kinyu Senmon Kaisha no Saiken Saimu no Shori no Sokushin tou ni kansuru Tokubetsu Sochi Hou, and supplementary provisions of Yokin Hoken Hou. The district court stated that "[t]he Japanese government created the RCC to carry out Japanese national policy related to revitalization of the Japanese financial system." Additionally, the district court found that "[o]ne of the primary functions of the RCC is to purchase, administer, collect and dispose of non-performing loans purchased from failed financial institutions, such as [the Bank], at the request of the Deposit Insurance Corporation of Japan, (`DICJ'), in accordance with Japanese Law." The district court also noted that many of the RCC's activities are performed exclusively by the RCC and the DICJ and that "[o]ther companies are not permitted to perform such activities even if they are in the loan collection business." Further, the district court found that "[t]he RCC is funded by the Japanese government," that "Japanese law provides that the [government-owned] DICJ will compensate the RCC for all losses at the end of every fiscal year," and that "[t]he financial impact of any failure to collect the [EIEG] loans and guarantees assigned by [the Bank] to the RCC, or of a monetary damage award ... in favor [of] EIE Guam against the RCC, will ultimately be borne by the Japanese government and the Japanese taxpayers." The district court's findings of fact all are supported in the record and thus are not clearly erroneous.
 
 
 24
 Those factors all point toward the RCC's being an organ of the Japanese government and, therefore, an "instrumentality" covered by the FSIA. EIEG attempts to overcome the weight of those factors by pointing out that the RCC is a private company that is engaged in a primarily commercial concern; that 29 other Japanese companies are authorized by the Japanese Ministry of Justice to collect distressed loans and assets; that the RCC's employees are not civil servants; and that the RCC is not a public corporation, a designation which, in Japan, is reserved for corporations established by the national government by special law as instruments for activities required by the state.
 
 
 25
 None of those arguments is availing. A company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants. Gates, 54 F.3d at 1461. As discussed above, the RCC and the DICJ engage in exclusive functions that other loan collection companies may not perform. As to the commercial nature of the RCC's work, we have held that "Congress' statement in the legislative history that a `state trading company' and `an export association' can be `organs' of a foreign state indicates Congress' belief that an entity's involvement in commercial affairs does not automatically render the entity non-governmental." Id. Finally, the district court's key assertion that the RCC's purpose "is to carry out Japanese national policy related to the revitalization of the Japanese financial system" is well supported in the record.
 
 
 26
 On balance, the relevant factors weigh in favor of a conclusion that the RCC is an organ of Japan. Additionally, the RCC compares favorably with other entities that we have labeled "organs" of foreign states under the FSIA.
 
 
 27
 In Gates, we held that Alberta Pork, a Canadian marketing board for hog producers formed pursuant to Alberta law, was an organ of the Province of Alberta. Id. This was so despite the fact that the Alberta Agricultural Products Marketing Council, which established the board, did not exercise day-to-day control over the board, but had only an "active supervisory role." Id. at 1460. The Council could authorize the board to set quotas for hog farmers, require farmers to provide information relating to the production and marketing of specified products, pay service charges, and the like. Id. at 1461. Noting the many ways in which the Council could delegate tasks to Alberta Pork, we held that the board was an organ of the Province of Alberta. Id.
 
 
 28
 In Corporacion Mexicana, we held that a subsidiary of a Mexican agency that owned and exploited that nation's petroleum resources was an organ of Mexico. The subsidiary was a separate legal entity. It was empowered to own property and carry on business in its own name and was administered by eight board members who were appointed by the federal government. 89 F.3d at 654. The government of Mexico guaranteed the subsidiary's performance. Id. In holding that the subsidiary was an organ of Mexico, we quoted the district court's explanation that
 
 
 29
 "[the subsidiary] is an integral part of the United Mexican States. [It] was created by the Mexican Constitution, Federal Organic Law, and Presidential Proclamation; it is entirely owned by the Mexican Government; is controlled entirely by government appointees; employs only public servants; and is charged with the exclusive responsibility of refining and distributing Mexican government property."
 
 
 30
 Id. at 655.
 
 
 31
 The RCC shares important similarities with the Mexican subsidiary in Corporacion Mexicana: Each body was created directly by public law, and the government guaranteed each body's performance. The RCC is even more clearly an organ of a foreign state than Alberta Pork was in Gates.
 
 
 32
 In view of the circumstances of its founding; its funding and financial connection to the government and taxpayers of Japan; its mission; and its purpose, we hold that the RCC is an organ of the Japanese government. It is therefore a "foreign state" within the meaning of the FSIA and is entitled to exercise the rights afforded foreign states under the FSIA.
 
 
 33
 B. The Action By EIEG Is "Against" the RCC.
 
 
 34
 Title 28 U.S.C. § 1441(d) permits removal to federal district court[4] of "[a]ny civil action brought in a State court[5] against a foreign state as defined [by the FSIA]." (Emphasis added.) EIEG asserts that this action was not removable under § 1441(d) because EIEG brought no claims "against" the RCC. In support, EIEG cites the well-worn maxim that the plaintiff's power to prevent removal
 
 
 35
 continues with the plaintiff throughout the litigation, so that whether such a case [is] nonremovable when commenced shall afterwards become removable depends not upon what the defendant may allege or prove or what the court may ... order, but solely upon the form which the plaintiff by his voluntary action shall give to the pleadings....
 
 
 36
 Great N. Ry. Co. v. Alexander, 246 U.S. 276, 282, 38 S.Ct. 237, 62 L.Ed. 713 (1918); see also Self v. Gen. Motors Corp., 588 F.2d 655, 658-59 (9th Cir.1978) (citing Great N. Ry. Co.).
 
 
 37
 We are not persuaded. EIEG clearly is asserting a claim against the RCC, even though EIEG did not explicitly name the RCC as a defendant. As the district court correctly observed:
 
 
 38
 The complaint asserts substantial claims against the RCC, as the assignee of [the Bank's] interest in the loans, mortgages, guarantees and security interests relating to the Hotel. Inter alia, EIE Guam's action seeks to preclude the RCC from enforcing those agreements and mortgages. EIE Guam also asserts that the RCC is affirmatively liable to EIE Guam for damages, at least through setoff.
 
 
 39
 The primary issue in dispute relates to the validity and enforceability of the loans, mortgages, guarantees and security interests executed by EIE Guam in favor of [the Bank] relating to the Hotel. [The Bank] has assigned the loans, mortgages, guarantees and security interests to the RCC. EIE Guam is no more willing to honor its obligations ... now that they have been assigned to the RCC....
 
 
 40
 The district court cited the Second Circuit's decision in Citibank, N.A. v. Nyland (CF8) Ltd., 878 F.2d 620 (2d Cir.1989), for the proposition that minimal adversity between a foreign state and the plaintiff suffices to justify the foreign state's removal of the action pursuant to the FSIA. In Nyland, one defendant alleged that the Philippines was only a "nominal defendant" and that, therefore, the Philippines did not have the power to remove the case to federal court under § 1441(d). Id. at 624. The Second Circuit disagreed, stating:
 
 
 41
 There is nothing in the text of the statute or in the legislative history to support [appellant's] contention that the Philippines' interests must be completely adverse to those of the plaintiff in order to remove this case to a federal court.... The Philippines has adequately demonstrated that its interests are adverse to those of Citibank. We therefore reject appellant's contention that the case should have been remanded to state court.
 
 
 42
 
 Id.
 
 
 
 43
 We agree with the Second Circuit's approach. In this case, there is no question that the RCC's interests are adverse to EIEG's. Nor can there be any doubt that EIEG's claim is "against" the RCC in a logical sense—EIEG seeks rulings from the court that would permit it to avoid paying money to the RCC that the RCC claims it is owed. The only question is whether EIEG can avoid this obvious result simply by choosing not to name the RCC in its complaint. It cannot.
 
 
 44
 EIEG quotes the principle that, to determine whether an originally nonremovable case became removable, we must rely "solely upon the form which the plaintiff by his voluntary action shall give to the pleadings." Self, 588 F.2d at 659. That passage does not support EIEG's assertion that its mere failure to name the RCC explicitly as a defendant means that this is not an action against the RCC. EIEG's "voluntary action," for example its litigation efforts to avoid paying a debt to the RCC, have in fact created claims against the RCC. In Self, the same case on which EIEG relies, we made clear that "the determination of whether federal subject-matter jurisdiction exists depends only upon plaintiff's complaint and the context in which it is found." Id. (emphasis added). We are not limited to the pleadings but must also examine the context of the case as a whole.[6] In other words, we do not exalt form over substance. The context of this case shows that it is in substance an action against the RCC, among other parties.
 
 
 45
 C. The RCC May Remove Despite the Fact That It Is a Voluntarily Joined Assignee.
 
 
 46
 EIEG argues that, even if the RCC is a foreign sovereign, the RCC may not remove because it obtained its interest voluntarily after the litigation had commenced. As a voluntarily joined assignee, EIEG claims, the RCC may exercise only the removal rights (if any) that were available to the original defendant, the Bank. The question we must answer is whether a foreign sovereign defendant who gained its interest in the litigation voluntarily, through an assignment after the suit had commenced, may remove the case to federal court under the FSIA's removal provision, 28 U.S.C. § 1441(d).
 
 
 47
 1. The Text of the Removal Statute of the FSIA
 
 
 48
 To answer that question, we begin with the text of the statute. See Coronado-Durazo v. INS, 123 F.3d 1322, 1324 (9th Cir.1997) (stating principle). The removal procedure established by 28 U.S.C. § 1441(d) reads:
 
 
 49
 Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.
 
 
 50
 On its face, § 1441(d) contains no restrictions on a foreign sovereign's right to remove. Indeed, even the usual time limit on the right of removal is relaxed. Under the most natural reading of the statute, a foreign sovereign that obtained a defendant's interest by assignment satisfies the criteria contained in the removal provision. Here, for instance, the suit (1) is a civil action, (2) was brought in State court, (3) and is against the RCC, a foreign state. Under a straightforward reading of § 1441(d), then, a later-joined foreign sovereign assignee apparently enjoys the same right of removal as a foreign sovereign that is an original defendant in a suit filed in state court.
 
 
 51
 Nevertheless, there is another plausible reading of the statute that could justify an opposite conclusion. When a plaintiff sues a nonforeign sovereign defendant in state court, only to have the original defendant transfer an interest in the case to a foreign sovereign that then joins and removes, arguably the action was not "brought ... against a foreign state," 28 U.S.C. § 1441(d), but rather was transformed into such an action after the case was "brought."
 
 
 52
 That reading is not unreasonable theoretically, but it is inconsistent with the way courts have interpreted the statute in other contexts. For example, other circuits have held that a foreign state that is brought into an action as a third-party defendant, rather than as an original defendant by the plaintiff, may remove the entire action to federal court. See, e.g., Davis v. McCourt, 226 F.3d 506, 509 (6th Cir.2000) ("We find that ... 28 U.S.C. § 1441(d) allows a foreign third-party defendant to remove an entire action from state court to district court."); In re Air Crash Disaster Near Roselawn, 96 F.3d 932, 942 (7th Cir.1996) (citing Nolan v. Boeing Co., 919 F.2d 1058, 1064 (5th Cir.1990), with approval); In re Surinam Airways Holding Co., 974 F.2d 1255, 1259 (11th Cir.1992) ("The [FSIA] ... intended to render uniform in procedure and substance the treatment of foreign sovereigns subjected to suits in American courts. Making a federal forum available to a foreign state furthers this goal, whether the foreign state is a defendant or a third-party defendant." (citations and internal quotation marks omitted)); Nolan, 919 F.2d at 1065 ("[W]e can perceive no significant distinction between the authorization for removal of an entire action by a sovereign co-defendant, and removal of an entire action by a sovereign third-party defendant."). Obviously, if a foreign state is brought into an action as a third-party defendant, the civil action was not originally "against" a foreign sovereign. Nevertheless, a foreign sovereign may remove pursuant to the FSIA in such circumstances. That the action is "against" the foreign sovereign at the time of the removal suffices to satisfy the requirements of the FSIA.
 
 
 53
 In short, there is nothing in the text of 28 U.S.C. § 1441(d), as interpreted by our sister circuits, to support EIEG's argument that a foreign state must be an original defendant in order to enjoy the power to remove under the FSIA. However, as EIEG points out, the RCC is not a third-party defendant, brought into this litigation without its active consent. Rather, it is a voluntarily joined defendant.
 
 
 54
 The fact that a foreign state that is brought into an action involuntarily may remove under § 1441(d) does not necessarily mean that a foreign state that chooses voluntarily to join litigation in progress, even as a defendant, enjoys the same right.[7] Because the text of the FSIA removal statute does not answer this question, we turn next to its legislative history to ascertain Congress' intent. See United States v. Davidson, 246 F.3d 1240, 1246 (9th Cir.2001) ("Where the plain language of a statute is ambiguous, a court may go beyond the words of the statute to examine the textual evolution of the [contested language] and the legislative history that may explain or elucidate it." (citations and internal quotation marks omitted)).
 
 2. Congressional Intent
 
 55
 The House Report for the FSIA states: "In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is important to give foreign states clear authority to remove to a Federal forum actions brought against them in the State courts." H.R. Rep. No. 94-1487, *32 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6631. Indeed, the House Report reflects Congress' belief that allowing foreign sovereigns to litigate in federal courts is so important that sovereigns should be permitted to drag along unconsenting co-defendants into federal court:
 
 
 56
 New subsection (d) of section 1441 permits the removal of any such action at the discretion of the foreign state, even if there are multiple defendants and some of these defendants desire not to remove the action or are citizens of the States in which the action has been brought.
 
 
 57
 
 Id.
 
 
 
 58
 The House Report indicates that Congress did not intend to allow foreign sovereigns to sit on their removal rights indefinitely, only to exercise them at a more strategic point in the litigation. However, although foreign sovereigns do not have carte blanche, the usual time limitations on removal are more relaxed for foreign states than for other defendants, clearly suggesting that Congress contemplated the possibility of "late" removal by a foreign state:
 
 
 59
 As with other removal provisions, a petition for removal must be filed with the appropriate district court in a timely manner. (28 U.S.C. 1446.) However, in the view of the 60-day period provided in section 1608(c) in the bill and in view of the bill's preference that actions involving foreign states be tried in federal courts, the time limitations for filing a petition of removal under 28 U.S.C. 1446 may be extended "at any time" for good cause shown.
 
 
 60
 
 Id.
 
 
 
 61
 Logically, Congress' twin concerns — the potential political sensitivity of actions against foreign states and the importance of developing a uniform body of federal law in this area — apply equally to a foreign state that is a "voluntary" defendant and to a foreign state that is an "involuntary" defendant. If the foreign sovereign's interests are at play, the "voluntary" nature of the sovereign's participation does nothing to diminish Congress' concerns about the need for sensitivity to foreign states and the need for uniformity of law in this area.
 
 
 62
 In this case, of course, the RCC knew that the present litigation was underway when it acquired its interest in the litigation. However, the RCC took on that interest pursuant to the policies of the government of Japan, and any obligations arising from a judgment in EIEG's favor would be borne by the government and the taxpayers of Japan. The need for sensitivity and uniformity is as strong here as in any other circumstance in which a foreign sovereign is a defendant.
 
 
 63
 EIEG counters that, despite the legislation's history and stated aims, Congress did not expressly allow voluntarily joining foreign states to remove under the FSIA. From this silence EIEG infers two things: First, that Congress must have meant to fall back on the "default" rule that an intervening party may not assert rights that could not have been asserted by the original parties and, second, that the existence of other statutes that do expressly permit post-joinder removal requires us to conclude that Congress intentionally forbade post-joinder removal here. We will address each of those arguments in turn.
 
 
 64
 (a) The "Default" Rule
 
 
 65
 As the main support for its first theory, EIEG cites two Supreme Court cases, dating from the mid-1880s, for the proposition that intervening assignees may not remove a case to federal court when the original defendant could not do so. Here, of course, it is undisputed that the Bank could not, and did not, remove the case to federal court.
 
 
 66
 The first case cited is Cable v. Ellis, 110 U.S. 389, 4 S.Ct. 85, 28 L.Ed. 186 (1884). There, an intervenor acquired, through assignment, rights in a diversity action that was already in progress. The Supreme Court held that the intervenor "can do nothing that might not have been done for him by his representative without his intervention. [The intervenor] took his place by intervention in the suit subject to all the disabilities that rested at the time on the party in whose stead he is to act." Id. at 398, 4 S.Ct. 85.
 
 
 67
 The second case that EIEG cites is Jefferson v. Driver, 117 U.S. 272, 6 S.Ct. 729, 29 L.Ed. 897 (1886). Jefferson also was a diversity case, in which the assignee was brought into the suit as a purchaser of the property at issue in the action. The Supreme Court held that, under Cable, the intervenor was not entitled to remove, because "[b]y purchasing pendente lite he connected himself with the suit, subject to the disabilities of the other parties in respect to a removal at the time he came in." Id. at 274-75, 6 S.Ct. 729.
 
 
 68
 Cable and Jefferson will not bear the weight for which EIEG contends. These cases were decided almost one hundred years before the enactment of the FSIA and the concomitant creation of removal rights in foreign states. Thus, these cases cannot and do not speak directly to the question of what Congress intended the FSIA rule to be. Their only potential value is, as EIEG claims, for the purpose of showing that there was a "background rule" against which Congress was acting, and thereby inferring from Congress' silence on the question of voluntarily joined foreign states that Congress understood and acquiesced in this background rule's application. Because of the legislative history showing that Congress rejected the diversity paradigm for foreign states when it passed the FSIA, we do not find these cases to be persuasive authority for even so limited a proposition.
 
 
 69
 Cable and Jefferson were diversity cases. In 1976, by enacting the FSIA, Congress indisputably removed foreign sovereigns from the diversity statutes.
 
 
 70
 Before the passage of the FSIA, the only source of a federal district court's subject matter jurisdiction in a case brought against a foreign state was the diversity jurisdiction provided by 28 U.S.C. § 1332(a)(2) and (3) (1970). See Jonathan Remy Nash, Pendent Party Jurisdiction Under the Foreign Sovereign Immunities Act, 16 B.U. Int'l L.J. 71, 75 (1998). Those provisions provided subject matter jurisdiction over
 
 
 71
 all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between —
 
 
 72
 . . . .
 
 
 73
 (2) citizens of a State, and foreign states or citizens or subjects thereof; and
 
 
 74
 (3) citizens of different States and in which foreign states or citizens or subjects thereof are additional parties.
 
 
 75
 28 U.S.C. § 1332(a)(2), (3) (1970).
 
 
 76
 The basis of federal jurisdiction in a suit against a foreign citizen or state was thus grounded entirely in diversity. The requirements were the same as for a suit by a citizen of one State against a citizen of another state. Id.
 
 
 77
 In passing the FSIA, Congress removed foreign sovereigns from the diversity category altogether. Now, the FSIA "is the sole basis of subject matter jurisdiction over suits involving foreign states and their agencies and instrumentalities." Phaneuf v. Republic of Indon., 106 F.3d 302, 304 (9th Cir.1997). Unlike diversity jurisdiction, where an amount-in-controversy threshold—now $75,000—remains, 28 U.S.C. § 1332, the FSIA contains no amount-in-controversy requirement, 28 U.S.C. § 1441(d). In other words, FSIA jurisdiction is its own special kind of federal jurisdiction and was intentionally divorced from diversity jurisdiction.
 
 
 78
 Significantly, Congress removed only foreign states — not foreign citizens — from the diversity statute. The only way for federal courts to exercise jurisdiction over controversies against foreign citizens still is through diversity. 28 U.S.C. § 1332. Congress clearly understood that it was singling out foreign sovereigns for special treatment when it created a new, exclusive basis of federal jurisdiction for cases involving foreign states.
 
 
 79
 Similarly, with respect to removal procedures, before the FSIA was enacted there was no special removal procedure available to a foreign state that was sued in state court. See Nash, 16 B.U. Int'l L.J. at 75. A foreign state could remove the action only under the "actions removable generally" provisions of 28 U.S.C. § 1441(a) (1970). When it passed the FSIA, Congress created a new removal statute, 28 U.S.C. § 1441(d). In short, not only did the FSIA create subject matter jurisdiction in the federal courts for actions against foreign states, but it also created an entirely new mechanism for removing such cases to the federal courts. The pre-FSIA diversity-based mechanisms were simply replaced for foreign states.
 
 
 80
 Even if Cable and Jefferson were the backdrop against which Congress acted in 1976, Congress demonstrated its intention to change the removal scenery. Congress transferred foreign states from diversity jurisdiction to their own special jurisdictional category. At the same time, Congress granted foreign sovereigns extraordinary removal rights. See Teledyne, Inc. v. Kone Corp., 892 F.2d 1404, 1409 (9th Cir.1989) (stating that "Congress explicitly drafted subsection 1441(d) as a provision to which the generally-applicable rules of removal do not apply").
 
 
 81
 (b) Other Removal Statutes
 
 
 82
 We next consider EIEG's argument that the FSIA, unlike some other federal statutes, does not explicitly grant a right of removal to foreign states after a transfer of a party's interest during the pendency of litigation. Citing the familiar canon of statutory construction that we should give effect to such a distinction, Gov't of Guam, ex rel. Guam Econ. Dev. Auth. v. United States, 179 F.3d 630, 638 (9th Cir.1999), EIEG argues that Congress' silence on the matter in the FSIA displays Congress' intent not to provide foreign states with a right of post-joinder removal to federal court.
 
 
 83
 EIEG points specifically to two provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. The first provision permits the Resolution Trust Corporation ("RTC") to remove an action to federal court after becoming a party:
 
 
 84
 The [RTC] ... may remove any action, suit, or proceeding from a State court to the United States district court.... The removal of any such suit or proceeding shall be instituted —
 
 
 85
 (i) not later than 90 days after the date the Corporation is substituted as a party, or
 
 
 86
 (ii) not later than 30 days after service on the Corporation, if the Corporation is named as a party in any capacity and if such suit is filed after August 9, 1989.
 
 
 87
 12 U.S.C. § 1441a(l)(3)(A).
 
 
 88
 The other provision that EIEG cites pertains to the Federal Deposit Insurance Corporation ("FDIC") and allows the FDIC to remove after it has been substituted as a party:
 
 
 89
 [T]he Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.
 
 
 90
 12 U.S.C. § 1819(b)(2)(B).
 
 
 91
 EIEG reads too much into those statutes. Those statutes allow the RTC and the FDIC, respectively, to remove "any" state-court action to federal district court. The references to the RTC's and the FDIC's substitution as a party appear only as part of the timeliness calculation. The substantive grant of the right to remove is contained in the first portion of each statute, which sets out that the corporation may remove "any" state-court action; the later reference to substitution only clarifies when the corporation may remove after joining. Indeed, the later reference to time restrictions on the removal right of a substituted corporation would be nonsensical if the earlier portion of the statute, granting the right to remove, did not encompass the right to remove after substitution.
 
 
 92
 Similarly, the FSIA allows a foreign state to remove "any" action brought against it in a state court. Instead of measuring the timeliness of a foreign state's removal by reference to the date on which the foreign state was named as a party, or became a party by substitution or joinder, Congress referred back to the usual "time limitations of section 1446(b)" and said that those time limits "may be enlarged at any time for cause shown." 28 U.S.C. § 1441(d) (emphasis added). If the time limits may be enlarged at any time, they may be enlarged after the foreign state has become a party by substitution or joinder so long as the district court concludes that the foreign state has showed good cause for the failure to meet the baseline time requirements of § 1446(b).
 
 3. Summary
 
 93
 Title 28 U.S.C. § 1441(d) provides that "[a]ny" civil action brought in state court against a foreign sovereign may be removed by the sovereign to federal court. The legislative history of the FSIA reveals Congress' robust intention to allow foreign states access to the federal courts subject only to a reasonable enlargement of the time for removal, id., and the existing check on abuse of that right:
 
 
 94
 A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.
 
 
 95
 28 U.S.C. § 1359.[8] Section 1441(d) consistently has been interpreted to allow foreign states that are named as third-party defendants in a state case already in progress to remove to federal court. The policies that led Congress to provide a federal forum to foreign states is just as strong when those states acquire an interest in ongoing litigation, and when they voluntarily join such litigation, as when they are named originally as defendants. We hold that a foreign state that acquires a defendant's interest in state-court litigation by assignment may remove the case to federal court under the FSIA, even if the foreign state joins the litigation voluntarily.
 
 
 96
 D. The RCC Did Not Submit To the Jurisdiction of the Guam Superior Court.
 
 
 97
 Even though the RCC enjoyed the right to remove the case to federal court, it is possible that it waived that right. "A party, generally the defendant, may waive the right to remove to federal court where, after it is apparent that the case is removable, the defendant takes actions in state court that manifest his or her intent to have the matter adjudicated there, and to abandon his or her right to a federal forum." Resolution Trust Corp. v. Bayside Developers, 43 F.3d 1230, 1240 (9th Cir.1994). "A waiver of the right of removal must be clear and unequivocal." Id. (citation and internal quotation marks omitted).
 
 
 98
 The RCC did nothing to waive its right to remove this case. The RCC filed a motion to remove the action the day after it was joined as a defendant. EIEG claims that the RCC led EIEG to believe that the RCC would not remove the action, but those pre-joinder statements were not a clear and unequivocal abandonment of the right to a federal forum. Once the case became removable, the RCC removed it immediately. We already have held that the act of joining itself did not destroy the RCC's right to remove.
 
 CONCLUSION
 
 99
 The RCC is a foreign state within the meaning of the FSIA. The present action is "against" the RCC as well as the Bank. The RCC was entitled to remove the case to federal court under the FSIA, even though it accepted assignment of an interest in the litigation during the course of the litigation, and even though it joined the action voluntarily after the action was already underway. Finally, the RCC did not waive its right to remove. Accordingly, the district court correctly held that it has subject matter jurisdiction. We AFFIRM the district court's exercise of jurisdiction and, for the reasons stated in a separately filed memorandum disposition concerning the merits of the appeal and the cross-appeal, REVERSE the district court's two May 2002 orders and REMAND the case for trial.
 
 
 100
 Each party shall bear its own costs on appeal.
 
 
 
 Notes:
 
 
 [1]
 Guam Rule of Civil Procedure 25(c) is identical to Federal Rule of Civil Procedure 25(c)
 
 
 [2]
 In this opinion, we address EIEG's challenge to subject matter jurisdiction. Because we hold that the district court has jurisdiction, we reach the remaining issues raised in the appeal and in the cross-appeal. Those remaining issues involve settled questions of law. We therefore address them in a separate memorandum disposition filed today, in which we reverse the district court's rulings and remand the case for trialEIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 2003 WL 549345 (9th Cir.2003) (unpublished disposition).
 
 
 [3]
 We have held that, under the FSIA, a corporation owned by an agency or instrumentality of a foreign government is not itself an instrumentality of that governmentGates, 54 F.3d at 1462. The Supreme Court has recently granted certiorari on this question. Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir.2001), cert. granted in part, ___ U.S. ___, 122 S.Ct. 2657, 153 L.Ed.2d 834 (2002). As the law currently stands, the RCC does not satisfy the "majority of shares owned by a foreign state" test. The pendency of Patrickson in the Supreme Court does not affect our decision here, however, because we rest our decision on a separate ground.
 
 
 [4]
 The District Court of Guam may exercise jurisdiction, even though it is not an Article III court. "The District Court of Guam shall have the jurisdiction of a district court of the United States, including, but not limited to, the diversity jurisdiction provided for in section 1332 of Title 28, and that of a bankruptcy court of the United States." 48 U.S.C. § 1424(b)
 
 
 [5]
 The territorial courts in Guam qualify as "State" courts for this purpose
 The relations between the courts established by the Constitution or laws of the United States and the local courts of Guam with respect to ... removal of causes ... shall be governed by the laws of the United States pertaining to the relations between the courts of the United States, including the Supreme Court of the United States, and the courts of the several States in such matters and proceedings[.]
 48 U.S.C. § 1424-2.
 
 
 [6]
 Indeed, immediately after stating this principle, theSelf court provided a footnote containing the example of Southern Pacific Co. v. Haight, 126 F.2d 900, 903-04 (9th Cir.1942). In Haight, the action was not removable based on the plaintiff's pleadings but became removable based on the plaintiff's subsequent conduct, even though the pleadings were never amended. See Self, 588 F.2d at 659 n. 5.
 
 
 [7]
 No circuit has answered this precise question. A judge of the Northern District of Texas has held that a foreign sovereign intervenor may not remove the case to federal court under the FSIA. JBaxter Brinkman Oil & Gas Corp. v. Thomas, 682 F. Supp. 898 (N.D.Tex. 1988). For the reasons detailed in this opinion, we are not persuaded by that court's conclusion.
 
 
 [8]
 No claim was made in this case that the district court lacked jurisdiction because of 28 U.S.C. § 1359