WILLIAMS, Senior Circuit Judge,
concurring:
I join my colleagues in affirming the dismissal of plaintiffs’ claim, holding that former Israeli General Moshe Ya’alon is entitled to immunity under the Foreign Sovereign Immunities Act (“FSIA”). In the events giving rise to this suit, he acted in his official capacity as an “agency or instrumentality” of the State of Israel within the meaning of 28 U.S.C. § 1603(b)(2). I write separately only to indicate the different paths taken to arrive at this destination.
1. Former Officials and Dole Food. Plaintiffs argue that General Ya’alon is not entitled to foreign sovereign immunity because his military service is over, and § 1603(b)(2)’s first clause defines an “agency or instrumentality of a foreign state” to include an entity that “is an organ of a foreign state or political subdivision thereof’ (emphasis added). Plaintiffs’ failure to raise the argument before the district court provides ample ground for rejection, and I join the court on that point. See Maj. Op. at 1284-85. I also agree with the majority — though for slightly different reasons — that if plaintiffs had properly raised the issue, it is unlikely we would have been convinced.
In Dole Food Co. v. Patrickson, 538 U.S. 468, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003), the Supreme Court addressed § 1603(b)(2)’s second clause, which includes as agencies or instrumentalities of a foreign state those entities “a majority of whose shares or other ownership interest is owned by a foreign state.” The Court held that a corporation must be directly owned by the foreign state itself, and owned at the time of suit, for the clause to apply. Id. at 477-78, 480, 123 S.Ct. 1655; *1291 see also Maj. Op. at 1285. An official’s status as an agency or instrumentality of a foreign state turns on a different clause of § 1603(b)(2): not the “is owned” language, but a separate passage providing agency- or-instrumentality status for an entity that “is an organ of a foreign state or political subdivision thereof.” Id. Plaintiffs argue that if “is owned” means owned at the time of suit, then an individual must, to receive immunity under § 1603(b)(2), be an active official at the time of suit.
I join the majority in rejecting this argument, see Maj. Op. at 1285-86, but I rest the conclusion not on the differences between corporations and human officials but on the differences between § 1603(b)(2)’s two clauses. Under the majority-ownership prong, a corporation’s immunity from suit depends solely on the foreign state’s direct ownership of a majority of the corporation’s shares; no closer relationship between the foreign state and the corporation is required. Dole Food holds that when that relationship is extinguished (even by the foreign state’s ownership dropping to fractionally less than a majority of shares), so too is the corporation’s claim to sovereign immunity. 538 U.S. at 478-80, 123 S.Ct. 1655. The agency relationship is quite different, however, when the individual or other entity has served as an organ of the foreign state; in such a case a finding of immunity will rest on the foreign state’s exercise of some degree of control and direction of the person’s or entity’s activities. Indeed, several decisions (before and after Dole Food) have found that corporations can qualify as “organs” of a foreign state under the first clause of § 1603(b)(2) independent of whether they meet Dole Food’s direct ownership requirement, see USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 206-16 (3d Cir.2003); EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd., 322 F.3d 635, 639-42 (9th Cir.2003); Kelly v. Syria Shell Petroleum Dev. B. V., 213 F.3d 841, 846-49 (5th Cir.2000), as did a recent separate opinion of Justice Breyer, see Powerex Corp. v. Reliant Energy Servs., — U.S. —, 127 S.Ct. 2411, 2424-26, 168 L.Ed.2d 112 (2007) (Breyer, J., dissenting).
This difference in the basic predicates of immunity under the two clauses entails quite different consequences for a change in the entity’s status over time. The only logically necessary impact on a foreign state of our exercising jurisdiction over a corporation it merely owned in the past is at best attenuated: the foreign state may receive a lower sales price for its majority stake if it cannot pass corporate immunity for past deeds along with ownership. But an individual’s or other entity’s lack of immunity for actions undertaken on the state’s behalf would have a significant impact on the foreign state and the United States’ relations with that state, particularly where (as here) the foreign state acknowledges its awareness and authorization of those acts. See Letter from Daniel Ayalon, Ambassador to the United States, State of Israel, to Nicholas Burns, Under Secretary for Political Affairs, State Department (Feb. 6, 2006) (“Ambassador’s Letter”). After all, foreign sovereign immunity is intended to be “a gesture of comity between the United States and other sovereigns.” Dole Food, 538 U.S. at 479, 123 S.Ct. 1655.
Thus, while we need not decide the issue, it strikes me as implausible that an official automatically ceases to qualify as “an organ of the foreign state” for the purposes of foreign sovereign immunity the minute he leaves his government post.
2. Alleged Violations of Jus Cogens and Israeli Law. Plaintiffs also argue that General Ya’alon’s actions were violations of Israeli law and oí jus cogens norms (norms so universally accepted that all states are *1292 deemed bound by them under international law, see, e.g., Committee of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 939-42 (D.C.Cir.1988), and, plaintiffs contend, disabled from authorizing their violation). According to plaintiffs, this forecloses his claim to have acted as an agency or instrumentality of the State of Israel. The majority takes plaintiffs’ arguments to be an assertion that § 1603(b)(2) contains an “unenumerated exception for violations of jus cogens norms,” Maj. Op. at 1287, and “an exception ... for foreign officials who violate their state’s laws,” id. at 1288. The majority has little trouble finding that we “rejected this precise argument” — in the context of § 1605’s waiver provisions — in Princz v. F.R.G., 26 F.3d 1166, 1173 (D.C.Cir.1994). Because I understand plaintiffs to make somewhat different assertions about the nature of FSIA immunity for individuals, I reject the argument for somewhat different reasons.
In Princz, we held that a foreign state does not impliedly waive its sovereign immunity under § 1605(a)(1) by committing violations of jus cogens. The suit in that case was against the Federal Republic of Germany, so there was no question that the FSIA entitled it to immunity in the absence of a specific exception, such as that of § 1605(a)(1). Here, however, the question is whether foreign sovereign immunity applies to General Ya’alon in the first place. Under our cases finding an individual to be an “organ” of a foreign state for purposes of § 1603(b)(2), immunity turns on whether Ya’alon acted in his official capacity as an agency or instrumentality of Israel during the events in question. Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027 (D.C.Cir.1997); El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C.Cir.1996); see also Maj. Op. at 1282-83. Plaintiffs’ argument that he did not is thus quite distinct from the argument rejected in Princz.
I agree with my colleagues, however, that our reasoning in Princz cautions against imputing to the FSIA, without “something more nearly express” from Congress, any bright-line rule that would call on us to “assume jurisdiction over the countless human rights cases” that could be brought against ruthless and murderous officials all over the world. See Maj. Op. at 1287 (quoting Princz, 26 F.3d at 1174 n. 1). Plaintiffs’ argument, though distinct from that addressed in Princz, would have precisely that effect. As the majority notes, no court decision compels any such proposition. Id. at 1287.
Besides implying a vast extension of our jurisdiction, plaintiffs’ argument poses another concrete problem. They assert that their characterization of Ya’alon’s conduct as violating jus cogens norms and Israeli law establishes an irrebuttable presumption that he acted without official authority. See Belhas Br. at 24 (“FSIA immunity does not encompass claims against individuals for violations of jus cogens norms, which can never be within the scope of an official’s authority.”); id. at 32 (“The assault on the United Nations compound and unarmed civilians is clearly contrary to the laws which Israel itself views as binding. As such, Defendant acted outside the scope of his lawful authority and is not immune.”). This approach merges the merits of the underlying claim with the issue of immunity, if Ya’alon’s actions were torture and extrajudicial killing, then they were necessarily unauthorized and he has no claim to immunity; if they were not torture and extrajudicial killing, he would enjoy immunity. Thus immunity could be determined only at the moment of resolution on the merits, at which point it would commonly be irrelevant. See Foremost-McKesson, Inc. v. Islamic Republic of *1293 Iran, 905 F.2d 438, 443 (D.C.Cir.1990) (“[Sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits.” (citation omitted)).
In any event, we can resolve the present case without reaching a final resolution of the role that claimed violations of jus co-gens or Israeli law might play in assessing Ya’alon’s status as agent of a foreign state. The conduct alleged in the complaint, notwithstanding plaintiffs’ characterization of that conduct, simply does not amount to such a violation. The most substantial allegations against General Ya’alon assert that he “participated in the decision to target the center of the UN compound during the course of the attack,” Complaint ¶ 35, and commanded soldiers involved in the Qana attack, id. ¶ 52. While plaintiffs characterize this conduct as violating both international and Israeli law, they point to no case where similar high-level decisions on military tactics and strategy during a modern military operation have been held to constitute torture or extrajudicial killing under international law, see Restatement (Third) of Foreign Relations Law § 702 cmt. g (1987); Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field art. 8(l)(d), Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31, or under the Torture Victim Protection Act (“TVPA”), 28 U.S.C. § 1350 (note). Thus we need not decide whether a clear violation of jus cogens would bar a finding that a defendant acted within the scope of his authority; any inroad that the nature of the conduct alleged here might make against the inference of such authority is amply offset by the letter of the Israeli ambassador confirming the view that General Ya’alon acted within the scope of his authority.
3. Torture Victim Protection Act I agree entirely with the majority that TVPA claims must comply with the FSIA for courts to have jurisdiction over individuals who acted in their official capacity as agencies or instrumentalities of a foreign state. See Maj. Op. at 1288-89. I part company with the majority only in that I find the relevant legislative history to be less helpful to our interpretive exercise, and in any event I would invoke somewhat different passages.
First, the majority states that “[wjhen Congress passed the TVPA in 1991, it did not amend the FSIA and instead appended it to the ATCA, a statute the Supreme Court held in Amerada Hess to be subject to all provisions in the FSIA.” Maj. Op. at 1289. Indeed Congress did not amend the FSIA, but a further inference of congressional intent from the placement of the statute within the United States Code is dubious, at least absent some indication— lacking here (see TVPA, Pub.L. 102-256, 106 Stat. 73 (1992)) — that Congress itself, rather than simply the Office of Law Revision Counsel, 2 U.S.C. §§ 285-285g, directed that placement. See Turner v. Glickman, 207 F.3d 419, 428-29 (7th Cir.2000); see generally Tobias A. Dorsey, Some Reflections on Not Reading the Statutes, 10 Green Bag 2d 283 (2007).
Second, while the House Report quoted by the majority does indicate that “[t]he TVPA is subject to the restrictions in the [FSIA],” in almost the next breath it states that “sovereign immunity would not generally be an available defense [to a TVPA claim].” H.R.Rep. No. 102-367, at 5 (1991). And the text of the Senate Report excerpted by the majority states more fully that “[t]he legislation uses the term ‘individual’ to make crystal clear that foreign states or their entities cannot be sued under this bill under any circumstances: only individuals may be sued. Consequently, the TVPA is not meant to override the Foreign Sovereign Immunities *1294 Act (FSIA) of 1976.” S.Rep. No. 102-249, at 7 (1991). These references suggest that at the time they enacted the TVPA, many members of Congress may not have realized the extent to which the FSIA covered individuals; indeed, at least one of our sister circuits has held that individuals cannot be agencies or instrumentalities of a foreign state under § 1603(b)(2). See Enahoro v. Abubakar, 408 F.3d 877, 881-82 (7th Cir.2005).
While I find the overall message of the legislative history to be mixed — and thus ultimately not that helpful — two passages not cited by the majority would seem to buttress our conclusion. The Senate Report quoted by the majority states elsewhere that “the committee does not intend [FSIA, diplomatic, and head-of-state] immunities to provide former officials with a defense to a lawsuit brought under [the TVPA]. To avoid liability by invoking the FSIA, a former official would have to prove an agency relationship to a state, which would require that the state admit some knowledge or authorization of relevant acts.” S.Rep. No. 102-249, at 8 (1991) (internal quotation marks omitted). Similarly, Senator Arlen Specter responded to a question by reiterating that “[i]n order to take advantage of the FSIA, a [TVPA] defendant would have to prove an agency relationship with the foreign state, which would have to admit some knowledge or authorization of the relevant acts.” 138 Cong. Rec. S2667-04, S2668 (daily ed. Mar. 3, 1992) (internal quotation marks omitted). Both of these passages are consistent with this circuit’s holding that an individual acting in his official capacity can claim immunity as an agency or instrumentality of the foreign state, see Jungquist, 115 F.3d at 1027; El-Fadl, 75 F.3d at 671, and with our emphasis in this case on the Israeli Ambassador’s unequivocal acknowledgement that General Ya’alon acted “in the course of [his] official duties, and in furtherance of official policies of the State of Israel.” Ambassador’s Letter, at 2.