**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PUBLIC UTILITIES
COMMISSION OF THE STATE OF
CALIFORNIA; CALIFORNIA ELECTRIC
OVERSIGHT BOARD,
                              *Petitioners,*

PACIFIC GAS AND ELECTRIC
COMPANY; NEVADA POWER
COMPANY; SOUTHERN CALIFORNIA
EDISON CO. ("EDISON");
DEPARTMENT OF WATER AND
POWER OF THE CITY OF LOS
ANGELES, PUBLIC SERVICE
DEPARTMENT OF THE CITY OF
BURBANK, PUBLIC SERVICE
DEPARTMENT OF THE CITY OF
GLENDALE, AND WATER AND POWER
DEPARTMENT OF THE CITY OF
PASADENA (COLLECTIVELY
"LADWP, ET AL."); SEMPRA
ENERGY; MIRANT AMERICAS ENERGY
MARKETING, L.P.; CORAL POWER;
PPM ENERGY; PUBLIC UTILITY
DISTRICT NO. 1 OF SNOHOMISH
COUNTY, WASHINGTON; DYNEGY
POWER MARKETING INC.,
                              *Intervenors,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                              *Respondent.*

No. 03-74207

FERC Nos.
EL02-60
EL02-62

19615

CALIFORNIA ELECTRIC OVERSIGHT
BOARD; CALIFORNIA PUBLIC
UTILITIES COMMISSION,
                    *Petitioners,*

NEVADA POWER COMPANY;
SOUTHERN CALIFORNIA EDISON CO.
("EDISON"); DEPARTMENT OF
WATER AND POWER OF THE CITY OF
LOS ANGELES, PUBLIC SERVICE
DEPARTMENT OF THE CITY OF
BURBANK, PUBLIC SERVICE
DEPARTMENT OF THE CITY OF                    No. 03-74246
GLENDALE, AND WATER AND POWER                  FERC No.
DEPARTMENT OF THE CITY OF                   EL 02-60-000
PASADENA (COLLECTIVELY
"LADWP, ET AL."); SEMPRA                       OPINION
ENERGY; MIRANT AMERICAS ENERGY
MARKETING, L.P.; PPM ENERGY;
PUBLIC UTILITY DISTRICT NO. 1 OF
SNOHOMISH COUNTY, WASHINGTON;
DYNEGY POWER MARKETING INC.,
                    *Intervenors,*

                v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent.*

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
December 8, 2004—Pasadena, California

Filed December 19, 2006

Before: James R. Browning, Harry Pregerson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

William J. Kayatta, Jr. (argued), Arocles Aguilar, Sean Gallagher, Jonathan Bromson, Public Utilities Commission of the State of California, San Francisco, California; William J. Kayatta, Jr., Jared S. des Rosiers, Louise K. Thomas, Deborah L. Shaw, Christopher T. Roach, Pierce Atwood, Portland, Maine; Erik N. Saltmarsh, Erin Koch-Goodman, California Electric Oversight Board, Sacramento, California (on the brief) for the petitioners.

Dennis Lane (argued), Cynthia A. Marlette, Dennis Lane, Lona T. Perry, Federal Energy Regulatory Commission, Washington, D.C. (on the brief) for the respondent.

Richard P. Bress (argued), John N. Estes III, W. Mason Emnett, Skadden, Arps, Slate, Meagher & Flom, LLP, New York, N.Y.; Jeffrey D. Watkiss, Bracewell & Patterson, Washington, D.C.; Richard P. Bress, Michael J. Gergen, David G. Tewksbury, Latham & Watkins, LLP, Washington, D.C. (on the brief) for the intervenors-respondents.

Roger A. Berliner, Stephen M. Ryan, Manatt, Phelps & Phillips, Washington, D.C.; C. Stanley Hunterton, Hunterton & Associates, Las Vegas, Nevada, on the joint brief for intervenors Public Utility District No. 1 of Snohomish County, Washington, Nevada Power Company, Sierra Pacific Power Company, and Southern California Water Company.

Julie Simon, Electric Power Supply Association, Washington, D.C.; Andrew B. Brown, Ellison, Schneider & Harris, LLP, Sacramento, California, on the *amici curiae* brief for the Independent Energy Producers Association, Electric Power Supply Association, and Western Power Trading Forum.

Marcus Wood, Jennifer E. Horan, Stoel Rives, LLP Portland, Oregon, on the brief of intervenor PPM Energy, Inc.

---

## OPINION

BERZON, Circuit Judge:

As in *Public Utility District No. 1 v. FERC* (*"PUD"*), Nos. 03-72511, et al. (9th Cir. Dec. __, 2006), a related case also decided today, the petitioners — here, the California Public Utilities Commission ("PUC") and the California Electric Oversight Board ("CEOB") (collectively, "Public Utilities Commission") — challenge the statutory validity of electric power rates in certain wholesale power contracts. Again as in *PUD*, that challenge hinges on whether the Federal Energy Regulatory Commission ("FERC") was correct to apply the *Mobile-Sierra*[1] "public interest" doctrine or whether in doing so it failed to meet its statutory obligation to provide "just and reasonable" review. *See* 16 U.S.C. § 824e(a).

---

[1]This shorthand takes its name from two Supreme Court cases decided on the same day: *United Gas Pipe Line Co. v. Mobile Gas Service Corp.* (*Mobile*), 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.* (*Sierra*), 350 U.S. 348 (1956).

In *PUD*, we explained that *Mobile-Sierra* represents a presumption "that private parties to a wholesale electric power contract have negotiated a 'just and reasonable' contract over a designated period of time, lawful under the FPA throughout that period." *PUD*, Slip Op. at 19554. That presumption, however, "can be rebutted by establishing that the contract adversely affects the public interest." *Id.*, Slip Op. at 19554. We concluded that, to establish the *Mobile-Sierra* presumption, "three prerequisites are necessary: (1) the contract by its own terms must not preclude the limited *Mobile-Sierra* review; (2) the regulatory scheme in which the contracts are formed must provide FERC with an opportunity for effective, timely review of the contracted rates; and (3) where, as here, FERC is relying on a market-based rate-setting system to produce just and reasonable rates, this review must permit consideration of all factors relevant to the propriety of the contract's formation." *Id.*, Slip Op. at 19555-56. In *PUD* we found two of these prerequisites lacking and remanded to FERC for it to consider the propriety of applying the *Mobile-Sierra* mode of review to the contracts at issue. We held, in the alternative, that even if *Mobile-Sierra* properly applied, FERC's "finding that the challenged contracts do not affect the public interest was based on a substantively erroneous mode of analysis." *Id.*, Slip Op. at 19549.

Applying *PUD* to the challenged contracts in this case, we grant the petition to review and remand to the agency to apply the modes of review outlined in *PUD*.

## I.

Much of the relevant background to this case is described in *PUD*. *See id.*, Slip Op. at 19567-83. We therefore will summarize only those facts relevant to the present case.

### A.   California Energy Crisis

California responded to the energy crisis outlined in *PUD* in several ways, although not until after "rolling blackout"

became a household phrase and several of California's largest utilities bordered on insolvency. Governor Gray Davis declared a state of emergency on January 17, 2001, and ordered the California Department of Water Resources ("CDWR") to purchase forward power "as expeditiously as possible." On February 1, 2001, the California Legislature passed Assembly Bill 1 of the 2001-2002 First Extraordinary Session ("AB1X"), which authorized CDWR to purchase power through the end of December 31, 2002.

Between February 6 and August 23, 2001, CDWR executed 57 forward contracts with 28 suppliers. Some of these contracts explicitly called for applying the relatively stringent *Mobile-Sierra* "public interest" test, rather than the relatively relaxed "just and reasonable" test to judge the rates included in the contracts. Other contracts were silent regarding the test to apply. The 57 contracts include 32 agreements with the intervenor-respondents in this case:[2]

- Coral Power, for prices from $169 to $249/MWh, for delivery in 2001 and 2002;

- Dynegy Power Marketing, Inc., for $119.50/ MWh, for delivery from January 1, 2002 through December 31, 2004;

- Mirant Americas Energy Marketing, for $148.65/ MWh, for delivery between June 1, 2001 and December 31, 2002;

- PacifiCorp ("PPM"), for $70/MWh, for delivery between July 29, 2001 and June 30, 2002; and

- Sempra Energy Resources, for $189/MWh, for

---

[2]These energy companies are all intervenors on behalf of FERC in this case.

delivery between June 1, 2001 and September 30, 2001.

Under AB1X, the people of California must pay the cost of these contracts through their electricity rates. *See* CAL. WATER CODE § 80104 (West) ("Upon the delivery of power to them, the retail end use customers shall be deemed to have purchased that power from the department. Payment for any sale shall be a direct obligation of the retail end use customer to the department."). Raymond Hart, who testified for the Public Utilities Commission, described this statutory provision as ensuring that costs of CDWR contracts would "be passed on to the retail end-users of the IOUs [investor-owned utilities] through their retail electricity rates." In other words, CDWR passed the costs of the power it purchased to local utilities — such as Pacific Gas and Electric — which, in turn, passed it on to California consumers. FERC questions whether the challenged contracts call for rates above long-run competitive prices, *Pub. Utils. Comm'n v. Sellers of Long Term Contracts*, 103 F.E.R.C. ¶ 61,354, at ¶62,415 (2003), but does not contest that the cost of those contracts is passed on to California consumers.

On June 19, 2001, FERC issued a price mitigation order for spot markets regarding several western states, which went into effect the following day. Subsequently, prices generally returned to pre-crisis levels in both spot and forward markets, completing a downward cycle that had begun about a month prior to the June 19 Order.

## B.   Procedural Background

On February 25, 2002, PUC filed complaints under section 206(a) of the Federal Power Act,**³** 16 U.S.C. § 824e(a), seek-

---

**³**Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded observed, charged, or collected by any public utility for any

ing modification of all power contracts signed by CDWR in 2001.[4] The only contracts at issue on this appeal are those listed above, which PUC alleges overcharge CDWR and California consumers by a total of $1.4 billion. In the process of adjudicating and ultimately denying these complaints, FERC issued a series of orders:

On April 25, 2002, FERC ordered a hearing to determine "whether the dysfunctional California spot markets adversely affected the long-term bilateral markets, and, if so, whether modification of any individual contract at issue [was] warranted." *Pub. Utils. Comm'n v. Sellers of Long Term Contracts*, 99 F.E.R.C. ¶ 61,087, at ¶ 61,384 (2002) (footnote omitted). FERC announced that it would review all contracts explicitly calling for "public interest" review under *Mobile-Sierra*,[5] while setting for hearing the question of whether it would also apply that standard to contracts that were silent on the issue.[6] *Id.* ¶ 61,383. FERC dismissed the complaints with regard to all contracts executed on or after June 20, 2001, the date its final price mitigation order went into effect, including the CDWR contract with PPM, which had been negotiated before but signed after that date. Finally, the April 25 order held that

---

transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affect such rate, charge, or classification is *unjust*, *unreasonable*, unduly discriminatory or preferential, the Commission shall determine the *just and reasonable* rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

16 U.S.C. § 824e(a) (emphases added).

[4]Much of the parties' disagreement hinges on whether the identity of the parties — state agencies other than those the one entered into the challenged agreements — affects the application of *Mobile-Sierra* to those agreements. As we decide, applying *PUD*, that FERC erred for other reasons by applying *Mobile-Sierra*, we need not reach the question of the impact of the parties' identity.

[5]These included the Coral and Mirant contracts.

[6]These included the Dynegy, Sempra, and PPM contracts.

both the PUC and CEOB " 'stepped into the shoes' of CDWR," which is not a party in this case, because they are all state agencies. *Id.* ¶ 61,382. Accordingly, the petitioners would both be treated as if they were the same entity as CDWR. *Id.*

Before the Administrative Law Judge ("ALJ"), PUC sought discovery regarding the sellers' ability to exercise market power in the spot markets. The ALJ denied this request, reasoning that "the hearing order in this case takes as a given the proposition that the California spot markets were dysfunctional." Additionally, the ALJ excluded some evidence, in the form of testimony by PUC's expert witnesses, that related to the sellers' market power in the forward markets.

At the conclusion of the ALJ's hearing, FERC created a two-track process. For contracts that had explicit provisions calling for the "public interest" test, FERC instructed the ALJ not to rule on those cases and instead to certify the record directly to the Commission. For the other contracts, the ALJ was directed to decide only whether the parties intended the public interest test to apply. *Pub. Utils. Comm'n v. Sellers of Long Term Contracts*, 101 F.E.R.C. ¶ 61,293, at ¶ 62,173 (2002).

On February 10, 2003, FERC, on remand from this court, *Pub. Utils. Comm'n of Cal. v. FERC*, Order of August 21, 2002, (9th Cir. Docket Nos. 01-71051, et al.), issued an order in a separate case relating to spot market manipulation, permitting discovery for over 100 days regarding such manipulation and requiring parties in that case to provide an index of discovered material "for each other pending or proposed proceeding" where the parties so request. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs.*, 102 F.E.R.C. ¶ 61,164, at ¶ 61,446 (2003). Through this "100 Days Proceeding," PUC discovered additional evidence regarding sellers' spot market manipulation.

On March 26, 2003, FERC staff issued its "Final Report on Price Manipulation in Western Markets." STAFF OF THE FEDERAL ENERGY REGULATORY COMMISSION, FINAL REPORT ON PRICE MANIPULATION IN WESTERN MARKETS: FACT-FINDING INVESTIGATION OF POTENTIAL MANIPULATION OF ELECTRIC AND NATURAL GAS PRICES ["Staff Report"] (2003), *available at http://www.ferc.gov/legal/maj-ord-reg/land-do cs/PART-I-3-26-03.pdf [Staff Report]. The Staff Report concluded that the spot market dysfunction had "significant" adverse effects on the forward markets. Id. at V-12.*

FERC issued an initial decision on June 26, 2003, rejecting all of PUC's claims. *Pub. Utils. Comm'n*, 103 F.E.R.C. ¶ 61,354 (2003). Most importantly, FERC concluded that the "public interest" test would apply to all contracts at issue, upholding the ALJ's opinion that parties to all contracts intended to trigger that test. *Id.* ¶ 62,409. Accordingly, evidence regarding the spot markets' adverse effect on forward markets — the very issue FERC initially deemed to be the purpose of the hearings — was deemed not "relevant," as the "just and reasonable" test did not apply. *Id.* ¶ 62,415. "Under the 'public interest' standard, to justify contract modification it is not enough to show that forward prices became unjust and unreasonable due to the impact of spot market dysfunctions; it must be shown that the rates, terms and conditions are contrary to the public interest."[7] *Id.* Further, FERC concluded that PUC failed to satisfy any of the three prongs of the public interest test established by Supreme Court precedent (described below) or "any other factor" that might go to public interest. *Id.* FERC found "no credible record evidence that the contracts at issue are placing Complainants in financial distress." *Id.* FERC based this conclusion on a comparison of CDWR's goal of "a portfolio that yielded a weighted average price no higher than $70/MWh" with its actual portfolio,

---

[7]This language appears verbatim in FERC's *PUD* orders. *See Nev. Power Co. v. Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61,353, at ¶ 61,397 (2003).

which averaged a price of $84/MWh for 2001-2005. *Id.* Commissioner Massey dissented, calling application of the "public interest" test inappropriate. Commissioner Massey also concluded that PUC proved a strong "nexus between the California spot market and the forward contract market," and that PUC met both the just and reasonable and public interest standards for contract reformation. *Id.* ¶¶ 62,448-49 (Massey, Comm'r, dissenting).

FERC denied rehearing on November 10, 2003. *Pub. Utils. Comm'n v. Sellers of Long Term Contracts*, 105 F.E.R.C. ¶ 61,182 (2003). One week later, PUC and CEOB filed petitions for review with this court.

## C.   Standard of Review

We review FERC's legal decisions de novo. *Am. Rivers v. FERC*, 201 F.3d 1186, 1194 (9th Cir. 1999). "Our review of a FERC decision is limited to whether the decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with the law." *Cal. Dep't of Water Res. v. FERC*, 341 F.3d 906, 910 (9th Cir. 2003); *see also* 5 U.S.C. § 706(2)(A). The court reviews factual findings for substantial evidence, 16 U.S.C. § 825*l*(b), and will uphold them so long as the agency considered all relevant factors and did not make a clear error of judgment, *Cal. Dep't of Water Res.*, 341 F.3d at 906. When an agency makes an informed choice to rely on one expert opinion among competing expert opinions, the agency is entitled to deference. *Bear Lake Watch, Inc. v. FERC*, 324 F.3d 1071, 1076-77 (9th Cir. 2003). FERC "is not obligated to justify deviations from an approach suggested by its own staff" unless "the conceptual underpinnings of the staff's approach [are] critical to a reasoned resolution of the problem"; in such cases FERC must address staff recommendations. *Pub. Utils. Comm'n v. FERC*, 817 F.2d 858, 862 (D.C. Cir. 1987).

## II.

## Application of *Mobile-Sierra*

**[1]** We hold in *PUD*, decided today, that FERC may apply the *Mobile-Sierra* "public interest" mode of review only if three conditions are present: "(1) the contract by its own terms must not preclude the limited *Mobile-Sierra* review; (2) the regulatory scheme in which the contracts are formed must provide FERC with an opportunity for effective, timely review of the contracted rates; and (3) where, as here, FERC is relying on a market-based rate-setting system to produce just and reasonable rates, this review must permit consideration of all factors relevant to the propriety of the contract's formation." *PUD*, Slip Op. at 19555-56. Here, it is undisputed that the contracts at issue either explicitly call for *Mobile-Sierra* review or do not preclude it. *Cf. PUD*, Slip Op. at 19589-93. Thus, resolution of the present case turns on whether the second two *Mobile-Sierra* prerequisites were met, permitting FERC to rely on the doctrine's presumption of just and reasonable rates.

### 1. *Timely and Effective Review of Rates*

**[2]** In *PUD*, we hold "that although market-based rate authority *can* qualify as sufficient prior review to justify limited *Mobile-Sierra* review, it can only do so when accompanied by effective oversight permitting timely reconsideration of market-based authorization if market conditions change." *Id.*, Slip Op. at 19593. Here, as in *PUD*, "the fatal flaw in FERC's approach to 'oversight' is that it precludes timely consideration of sudden market changes and offers no protection to purchasers victimized by the abuses of sellers or dysfunctional market conditions that FERC itself only notices in hindsight." *Id.*, Slip Op. at 19603.

Energy company intervenors and amici argue here, as FERC did in *PUD*, that petitioners or CDWR should have

challenged the sellers' market-based rate authority before entering into the forward contracts, rather than agree to and subsequently challenge the contracts. This argument fails for the same reasons it failed in *PUD*. *See id.*, Slip Op. at 19601-02 ("Any such challenge, even if successful, could not have been a basis for reforming the challenged contracts . . . ." ).

Dynegy raises an argument unique to its contract, which it did file with FERC, effective March 6, 2001, and which FERC opened to the public for comments.[8] *Dynegy Power Mktg., Inc.*, 95 F.E.R.C. ¶ 61,371 (2001). Dynegy asserts that PUC had an opportunity, during the public comment period, to raise a substantive challenge to this contract but declined to do so.

Nothing about this circumstance, however, justifies a contrary result from that reached with regard to all the other contracts. FERC explicitly noted that accepting the filing of the Dynegy contract did "not constitute approval of any . . . rate . . . ; and such action is without prejudice to any findings or orders which . . . may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against Dynegy." *Id.* ¶ 62,401. FERC, therefore, did not give prior approval to the Dynegy contract any more than it did for any of the other contracts challenged here. Further, any challenge to the contract at the time FERC sought public comments would have been hampered by limited information: At the time Dynegy filed its contract, the full scale of spot market manipulation and forward market dysfunction was not nearly as fully known as it is today.

---

[8]Dynegy's argument on this point refers only to the prior review prerequisite to application of *Mobile-Sierra*. Even if its argument succeeded on this point, it would not be sufficient to overcome the other portions of our opinion which provide independent reasons for granting PUC's petition for review.

**[3]** For these reasons, we hold here that FERC "cannot use [its] choice [of regulatory regime] to excuse its duty to maintain effective oversight [of rates] and then invoke *Mobile-Sierra* as a ground for precluding ordinary rate review, including review of the propriety of market-based rate authority at the time the contracts became effective." *PUD*, Slip Op. at 19603.

## 2.   *Meaningful Review of Contract Formation*

**[4]** Even if the agency had not committed "[t]his fundamental procedural error[,] . . . FERC's substantive adherence to *Mobile-Sierra* without regard to the market conditions in which the contracts at issue were formed" was error. *Id.*, Slip Op. at 19604. In particular, FERC refused to consider evidence of forward market dysfunction caused by the spot market, asserting that such evidence was not "relevant" unless the "just and reasonable" test applied. *Pub. Utils. Comm'n*, 103 F.E.R.C. at ¶ 62,415. Because "*Mobile-Sierra* cannot apply without a determination that the challenged contract was initially formed free from the influence of improper factors, such as market manipulation, the leverage of market power, or an otherwise dysfunctional market," *PUD*, Slip Op. at 19604, FERC's reliance on the "public interest" mode of review here was improper.

**[5]** As in *PUD*, FERC failed to respond to the Staff Report. *See PUD*, Slip Op. at 19604-06. Rather than consider its discussion of the dysfunction in the forward market, FERC treated the Staff Report's conclusions as only relevant if it was *first* determined that just and reasonable review is applicable, the same way it treated other evidence of market dysfunction. *Pub. Utils. Comm'n*, 103 F.E.R.C. at ¶ 62,415 & n.38. This was error. *See PUD*, Slip Op. at 19606 ("[T]he questions raised by the Staff Report — whether and how the manipulated spot market influenced the forward markets — *are* relevant to determining whether the *Mobile-Sierra* doctrine applies, because they raise questions about the market

conditions at the time of contract formation and thus about the propriety of relying on a regime of market-based rate authority at that time to produce just and reasonable rates.").

**[6]** FERC also affirmed the ALJ's exclusion of some of PUC's other evidence — including testimony of expert witnesses — regarding the effect of spot market manipulation on forward prices. As *PUD* makes clear, such evidence is essential to the question of whether the forward energy market was sufficiently well-functioning to apply *Mobile-Sierra. See id.*, Slip Op. at 19605-06.

**[7]** On remand, FERC should consider the excluded evidence, as well as all other relevant evidence — whether part of the "100 Day Proceeding" or not — before determining whether the *Mobile-Sierra* presumption applies.

### 3. *Effect on the "Public Interest"*

**[8]** Consistent with *PUD*, "FERC's error in its approach to deciding *whether* to apply the *Mobile-Sierra* presumption was compounded by it use of an erroneous standard for determining whether the challenged contracts affect the public interest." *Id.*, Slip Op. at 19606-07. "In its efforts to determine the impact on the public interest under *Mobile-Sierra* . . . FERC relied on the wrong legal standard, applying factors taken from the context of a *low-rate* challenge rather than those relevant to the *high-rate* challenge present in this case." *Id.*, Slip Op. at 19607.

FERC determined that the challenged contracts in this case did not affect the public interest because PUC:

> presented very little evidence relevant to the *Mobile-Sierra* standard of review. Based on the record, we conclude that Complainants have failed to demonstrate that any of the three prongs announced in the *Sierra* case has been met or that any other factor

introduced into evidence warrants a finding that any of the contracts is contrary to the public interest and should be modified.[9]

*Pub. Utils. Comm'n*, 103 F.E.R.C. at ¶ 62,415. FERC determined that because consumers did not face an "excessive burden" whether consumers endured *any* burden was inapposite. *Pub. Utils. Comm'n*, 105 F.E.R.C. 61,182, at ¶¶ 66-67. As we explained in *PUD*, this determination fundamentally misunderstands the public interest inquiry in the context of a high-rate challenge. *See PUD*, Slip Op. at 19607-11.

[9] Under California law, all costs of the challenged contracts were passed on to consumers. *See* CAL. WATER CODE § 80104. The parties debate whether retail power rates in fact increased after the parties signed these contracts, but this dispute is not determinative. Even if rates did not increase in the months after CDWR signed the contracts, the retail rates charged consumers because of these contracts might have been higher than they would have been had the wholesale contract rates been lower. *See PUD*, Slip Op. at 19609 ("[I]f a challenged contract imposes any significant cost on ultimate customers because of a wholesale rate too high to be within a zone of reasonableness*,* that contract affects the public interest." (citations omitted)).

## III.

Finally, we grant PUC's petition as it relates to FERC's dismissal of its complaint regarding CDWR's contract with

---

[9]In such circumstances [when the public interest test satisfies the Commission's duty to ensure just and reasonable rates] the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest — as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory.

*Sierra*, 350 U.S. at 355.

PPM. FERC's decision to dismiss the case against the PPM contract without a hearing may be affirmed only if FERC addressed all "relevant factors in dispute and . . . a formal hearing was unnecessary for the Commission to reach its conclusion." *Pac. Gas & Elec. Co. v. FERC*, 746 F.2d 1383, 1386 (9th Cir. 1984). We believe FERC failed to address all relevant factors here.

**[10]** FERC dismissed the PPM challenge because the parties entered the contract after FERC's June 19 Order. *Pub. Utils. Comm'n*, 99 F.E.R.C. ¶ 61,087, at ¶¶ 61,383-84 (2002). FERC did not consider, however, whether some market dysfunction may have lingered after that order took effect. PPM, intervening in this case, argues that the chronology of its contract factually distinguishes it from the other challenged contracts. We disagree.

**[11]** It is not at all clear that the forward markets had stabilized by the date when the parties entered the PPM contract. On the contrary, FERC's Staff Report concluded that contracts entered after June 19, 2001, "generally show a persistence of the effects found during the crisis, i.e., statistically significant positive elasticities of the forward price with respect to the spot price." Staff Report at V-14. While the Staff Report qualified its conclusion regarding post-June 19 effects of market power, noting that, "[o]n average," post-June 19 contracts demonstrated a lesser effect from the spot markets than pre-June 19 contracts, FERC should have at least considered the possibility that ill effects remained. Therefore, the agency's dismissal of the challenge was inappropriate.

## IV.

**[12]** For the foregoing reasons, we determine that a remand is necessary so that FERC can apply the proper statutory standards to determine, first, whether *Mobile-Sierra* review of the challenged contracts is appropriate; second, if so, to apply the

modified form of *Mobile-Sierra* review outlined in *PUD* and referenced in this opinion; and finally, if not, to apply full just and reasonable review to the challenged contracts.

**PETITION FOR REVIEW GRANTED AND REMANDED.**