**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA DEPARTMENT OF WATER
RESOURCES,
　　　　　*Plaintiff-Appellee,*

　　　　　v.

POWEREX CORP., a Canadian
Corporation, dba POWEREX ENERGY
CORP.,

　　　　　*Defendant-Appellant.*

No. 06-15285

D.C. No.
CV-05-00518-GEB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
December 4, 2007—San Francisco, California

Filed July 22, 2008

Before: Robert E. Cowen,* Michael Daly Hawkins and
N. Randy Smith, Circuit Judges.

Opinion by Judge Hawkins

---

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

8969

## COUNSEL

David C. Frederick (briefed and argued), Kellogg, Huber, Hansen, Todd, Evans and Figel, Washington, D.C., for the defendant-appellant.

Annadel A. Almendras (briefed and argued) and Song J. Hill (briefed), Office of the Attorney General of the State of California, San Francisco, California, for the plaintiff-appellee.

Mark B. Stern (briefed and argued) and Alisa B. Klein (briefed), United States Department of Justice, Washington, D.C., for the United States as amicus curiae.

Roy T. Englert, Jr. (briefed), Robbins, Russell, Englert, Orseck and Untereiner, Washington, D.C., for the Province of British Columbia as amicus curiae.

Margaret K. Pfeiffer (briefed), Sullivan and Cromwell, Washington, D.C., for the Government of Canada as amicus curiae.

---

## OPINION

HAWKINS, Circuit Judge:

In this second look, we re-examine whether Powerex, a Canadian corporation that markets and distributes electric power, is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act of 1976 ("FSIA"). 28 U.S.C. § 1603(a), (b). Four years ago, we held that it was not, but the Supreme Court vacated that decision without resolving the issue. *California v. NRG Energy Inc.*, 391 F.3d 1011, 1026 (9th Cir. 2004), *vacated sub nom. Powerex Corp. v. Reliant Energy Servs., Inc.*, 127 S. Ct. 2411 (2007).

To reach that question, we must first consider whether 28 U.S.C. § 1447(d) deprives us of the authority to review a district court's decision to decline an exercise of supplemental jurisdiction and remand to state court. Holding that it does not, we also must decide whether a writ of mandamus is the only means of obtaining review of a 28 U.S.C. § 1367(c) remand, or whether an appeal under 28 U.S.C. § 1291 will suffice.

## I.   General Facts and Procedural Background

This is one of many cases arising out of the 2000-2001 California energy crisis.[1] By February 2001, the state's deregulated energy markets had experienced "a rapid, unforeseen shortage of electric power and energy available in the state and rapid and substantial increases in wholesale energy costs and retail energy rates." Cal. Water Code § 80000(a). This caused rolling blackouts throughout California and "constitute[d] an immediate peril to the health, safety, life, and property" of Californians. *Id.*

In response, the California Legislature turned to the state's Department of Water Resources ("DWR"), giving it a mandate: "do those things necessary and authorized" under the Water Code "to make power available directly or indirectly to electric consumers in California." Cal. Water Code § 80012. To fulfill this responsibility, DWR was empowered to contract with any person or entity for the purchase of power. *Id.* § 80100. According to DWR's Amended Complaint, between January 17, 2001,[2] and December 31, 2001, DWR and Powerex transacted thousands of "out of market" purchases and "numerous exchange transactions."[3]

---

[1]*See, e.g.*, *Port of Seattle v. FERC*, 499 F.3d 1016 (9th Cir. 2007); *Pub. Utils. Comm'n of Cal. v. FERC*, 474 F.3d 587 (9th Cir. 2006); *Pub. Util. Dist. No. 1 of Snohomish County v. FERC*, 471 F.3d 1053 (9th Cir. 2006); *Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861 (9th Cir. 2006); *Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005); *California ex rel. Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004).

[2]From mid-January 2001 until February 1, 2001, DWR was authorized to purchase power under statutorily-granted emergency authority. Cal. Water Code § 200 (2001) (repealed 2002).

[3]According to DWR's Amended Complaint, an "exchange transaction" is one in which "an out-of-market supplier agrees to deliver a requested amount of electricity to a counter-party in return for the counter-party's promise to provide an equal or greater volume of power in the future." Allegedly, Powerex frequently insisted on receiving 2.5 megawatts of power for every megawatt it provided.

In February 2005, DWR filed suit against Powerex in California state court, alleging Powerex had "manipulated the California energy markets through Enron-style gaming and trading strategies." More specifically,

> Powerex was aware of and participated in the market manipulation and market gaming that resulted in the California Energy Crisis. The manipulation and gaming activity tended to tighten the supply of electricity in the California energy markets. The tightening of supply was part of a larger plan that allowed marketers, including Powerex, to give the appearance of a shortage of supply in the markets . . . .

Alleging various violations of state contract law, the complaint sought a declaration that all these transactions were void, rescission of all transactions, restoration of all money and benefits that unjustly enriched Powerex, and compensatory damages.

In response, Powerex removed the case to federal court, citing the Federal Power Act, 16 U.S.C. § 825p, and FSIA, 28 U.S.C. § 1441(d). DWR moved to remand the case back to state court, and Powerex moved to dismiss. The district court denied the motion to remand, finding that DWR's complaint was artfully plead and that it presented a substantial federal question. Turning to the merits, the court then dismissed the case because the "Plaintiff's claims require the determination of the fair price of the electricity that was delivered under the contracts," which placed the action squarely within the Federal Energy Regulatory Commission's exclusive jurisdiction.

DWR responded with an amended complaint requesting only declaratory relief stating that the transactions between the parties were void. No longer seeking rescission, restitu-

tion, or damages, DWR moved to remand anew under 28 U.S.C. § 1447(c)[4] and 28 U.S.C. § 1367(c).

This time, the district court found that the Amended Complaint presented only state law contract issues. The district court also found Powerex's FSIA argument squarely foreclosed by our decision in *California v. NRG Energy Inc.*, 391 F.3d 1011 (9th Cir. 2004), in which we determined Powerex was not a "foreign state."

Because the Amended Complaint did not present a federal question, the district court had the discretion to decline supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Recognizing that all the claims over which it had original jurisdiction had been dismissed, the court remanded the case to the California court because the Eleventh Amendment and the "values of economy, convenience, fairness, and comity" all weighed in favor of dismissing the state law claims as well. *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-27 (1966)).

On appeal, Powerex argues that the district court erred by finding that the corporation is not a "foreign state," and that DWR's Amended Complaint in fact presents claims that "arise under" the Federal Power Act.

## II.   Jurisdiction

We confront two jurisdictional issues. As a threshold matter, we must address DWR's contention that 28 U.S.C. § 1447(d) bars us from exercising jurisdiction. If that hurdle

---

[4]In relevant part, § 1447(c) states: "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."

can be leapt, we then must decide whether Powerex can contest the district court's remand order by way of an appeal under 28 U.S.C. § 1291, or whether a writ of mandamus is the exclusive remedy.

## A.   28 U.S.C. § 1447(d)

At argument, DWR asserted that 28 U.S.C. § 1447(d) precludes this court from reviewing the remand order. That statute provides:

> An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1443 of this title [pertaining to certain civil rights cases] shall be reviewable by appeal or otherwise.

**[1]** Although this language appears comprehensive, the Supreme Court has explained that the provision does not prohibit review of all types of remands. Rather, "§ 1447(d) must be read *in pari materia* with § 1447(c), so that only remands based on grounds specified in § 1447(c) are immune from review under § 1447(d)." *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 127 (1995) (citing *Thermtron Prods., Inc. v. Hermansdorfer*, 423 U.S. 336, 345-46 (1976)). Thus, only remands based on defects in removal procedure or on lack of subject-matter jurisdiction escape our review. *Id.* at 127-28.

**[2]** Here the district court clearly identified 28 U.S.C. § 1367(c) as the source of its authority to remand, and explicitly stated that it was declining to exercise supplemental jurisdiction. In this circuit, "a district court's order remanding pendent state claims on discretionary grounds [is] not pursuant to § 1447(c)," and thus a "district court's discretionary remand of pendent state claims is a reviewable order." *Lee v.*

*City of Beaumont*, 12 F.3d 933, 935 (9th Cir. 1993) (internal quotation marks omitted); *see also Niehaus v. Greyhound Lines, Inc.*, 173 F.3d 1207, 1210-11 (9th Cir. 1999); *Executive Software N. Am., Inc. v. U.S. Dist. Court,* 24 F.3d 1545, 1549 (9th Cir. 1994).

As DWR notes, the Federal Circuit has come to the opposite conclusion, holding that "a remand based on declining supplemental jurisdiction must be considered within the class of remands described in § 1447(c) and thus barred from appellate review by § 1447(d)." *HIF BIO, Inc. v. Yung Shin Pharm. Indus. Co.*, 508 F.3d 659, 667 (Fed. Cir. 2007). That decision, which split with several circuits, *id.* at 665, found support in the Supreme Court's recent statement that "[i]t is far from clear . . . that when discretionary supplemental jurisdiction is declined the remand is not based on lack of subject-matter jurisdiction for purposes of § 1447(c) and § 1447(d)." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 127 S. Ct. 2411, 2418-19 (2007).

**[3]** The Federal Circuit's disagreement does not give a three-judge panel in this circuit license to overrule the binding, authoritative decision of a prior three-judge panel. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc). Similarly, that the question remains unanswered by the Supreme Court does not relax our obligation to abide by stare decisis. In light of clear precedent, then, we hold that review of a district court's decision to decline an exercise of supplemental jurisdiction is not barred by § 1447(d).

## B.  Appeal or Mandamus

**[4]** Having decided that we are not statutorily precluded from examining the district court's remand order, we now consider whether a discretionary decision to decline supplemental jurisdiction under 28 U.S.C. § 1367(c) must be challenged in a petition for writ of mandamus ("mandamus petition"), or pursuant to an appeal under 28 U.S.C. § 1291.

Although our precedents have held that a mandamus petition is the exclusive procedure, we believe that intervening Supreme Court authority is clearly irreconcilable with such a rule, and we therefore take the unusual step of departing from our earlier decisions.

In both its Notice of Appeal and its brief, Powerex identifies 28 U.S.C. § 1291 as the basis for our jurisdiction. Although neither party addresses the mandamus issue, we have an obligation to satisfy ourselves that jurisdiction properly lies. *Snodgrass v. Provident Life & Accident Ins. Co.*, 147 F.3d 1163, 1165 (9th Cir. 1998) (per curiam).

The distinction between mandamus and appellate review is greater than a simple difference in filing requirements. It is considerably more difficult to obtain a writ of mandamus, for a petitioner will not succeed simply by identifying a lower court's legal error. *See Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977) (five-factor balancing test to guide appellate court's mandamus analysis, including whether "district court's order is clearly erroneous as a matter of law"); *see also In re Morgan*, 506 F.3d 705, 712-13 (9th Cir. 2007) (applying *Bauman* test).

For example, if we were to hold that the district court erroneously concluded that Powerex was not a "foreign state," we would reverse the court on an appeal, but it does not necessarily follow that we would issue a writ of mandamus if we thought the district court's decision was not clearly erroneous, *see In re Morgan*, 506 F.3d at 713, or an "important issue of first impression," *San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1100 (9th Cir. 1999).

Generally, when a district court remands to state court after exercising its discretion to decline supplemental state law claims, an aggrieved party must seek mandamus relief.[5] This

_____

[5]Our discussion oversimplifies our jurisprudence. In reality, this circuit developed a test that distinguishes between remands based solely on "ju-

rule was first announced in *Survival Systems Division of the Whittaker Corp. v. U.S. District Court*, 825 F.3d 1416, 1418 (9th Cir. 1987), and has been reaffirmed in subsequent cases, *see, e.g.*, *Executive Software N. Am., Inc. v. U.S. Dist. Ct.*, 24 F.3d 1545, 1549-50 (9th Cir. 1994); *Lee*, 12 F.3d at 935-36. Under our precedents, Powerex's § 1291 appeal would fail, and we would have to decide whether to treat the appeal as a mandamus petition. *See Lee*, 12 F.3d at 936.

**[5]** We believe, however, that an intervening Supreme Court decision, *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996), is clearly irreconcilable with our earlier cases. A review of the pre-*Quackenbush* case law will illuminate our thinking.

Our rule proscribing § 1291 review of remand orders that follow declines of supplemental jurisdiction traces its roots back to the Supreme Court's decision in *Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The *Thermtron* Court was confronted with a remand to state court of a properly-removed case. Similar to the analysis we present today, the Court conducted a two-step jurisdictional inquiry. First, it announced the rule, discussed above, that 28 U.S.C. § 1447(c) and § 1447(d) must be read *in pari materia*, and the Court found that the remand at issue was not based on the grounds listed in § 1447(c) and thus not immune from review. *Thermtron*, 423 U.S. at 351-52.

---

risdictional decisions," which could only be reviewed by way of a mandamus petition, and remands that followed "substantive decisions," which could be appealed. *See, e.g.*, *Lee*, 12 F.3d at 935-36 (explaining that an exception to the general mandamus requirement "occurs where the district court bases the remand order on a substantive decision"); *Price*, 829 F.2d at 874 (holding that remand order was only reviewable by way of a mandamus petition because "the remand order did not result from a determination on the merits of a non-jurisdictional issue"). For the purpose of this appeal and our holding, however, the simplified discussion suffices.

Second, the *Themtron* court determined that the defendant had properly chosen to petition for a writ of mandamus instead of pursuing an appeal. *Id.* at 352. The Court explained that "because an order remanding a removed action does not represent a final judgment reviewable by appeal, [t]he remedy in such a case is by mandamus to compel action." *Id.* at 352-53 (internal quotation marks omitted; alteration in original). In this part of the jurisdictional analysis, *Thermtron* appeared to announce a bright-line rule: remand orders that fall outside the scope of § 1447(d) are reviewable only by a mandamus petition.[6]

The situation became more complicated, however, with the Supreme Court's subsequent decision in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1 (1983). *Moses H. Cone* dealt not with a remand order, but with a district court's stay of a case pending the outcome of a concurrent state court suit. 460 U.S. at 4. Because the state and federal actions presented an identical issue, the district court concluded that the Supreme Court's decision in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), counseled deference to the state proceeding. *Moses H. Cone*, 460 U.S. at 4, 7.

The stay was appealed to the Court of Appeals under 28 U.S.C. § 1291. That statute provides, in relevant part, that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States." One of the questions before the Supreme Court was whether a *Colorado River* based stay was a "final decision" for purposes of § 1291. *Moses H. Cone*, 460 U.S. at 8-9.

---

[6]By holding that a mandamus petition was the proper means for challenging a remand order, *Thermtron* effectively held that there is no jurisdiction under 28 U.S.C. § 1291. As the Supreme Court explained in a later decision, "a court of appeals has no occasion to engage in extraordinary review by mandamus 'in aid of [its] jurisdictio[n],' 28 U.S.C. § 1651, when it can exercise the same review by a contemporaneous ordinary appeal." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 8 n.6 (1983) (alterations in original).

Citing two separate rationales, *Moses H. Cone* found the stay "final" within the meaning of § 1291. As explained in *Idlewild Bon Voyage Liquor Corp. v. Epstein*, a district court order that places the parties "effectively out of court" is final and appealable. 370 U.S. 713, 715 n.2 (1962) (per curiam) (internal quotation marks omitted). *Moses H. Cone* made clear that " '[e]ffectively out of court' means effectively out of *federal* court." 460 U.S. at 9 n.8. Because the *Colorado River* stay anticipated a possible state court resolution of the issue that might have res judicata effect in federal court, the order "amount[ed] to a dismissal of the suit" and the Court of Appeals had jurisdiction under § 1291. *Id.* at 10. Summing up the limited nature of the *Idlewild* doctrine, *Moses H. Cone* explained that a stay order is final only "when the sole purpose and effect of the stay are precisely to surrender jurisdiction of a federal suit to a state court." *Id.* at 11 n.11.7

As an alternative to its reliance on *Idlewild*, *Moses H. Cone* found that the stay was final under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). That doctrine recognizes that a "small class" of decisions is appealable under § 1291, even though they do not satisfy the ordinary definition of finality. *Id.* at 546. For a collateral order to be appealable, it must: (1) " 'conclusively determine the disputed question,' " (2) " 'resolve an important issue completely separate from the merits of the action,' " and (3) " 'be effectively unreviewable on appeal from a final judgment.' " *Moses H. Cone*, 460 U.S. at 11-12 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

The stay order at issue in *Moses H. Cone* undoubtedly satisfied the second and third criteria, but one of the parties argued that it did not "conclusively determine the disputed question." The Court rejected that position because "there [was] no basis to suppose that the District Judge contemplated any reconsideration of his decision to defer to the parallel state-court suit." *Moses H. Cone*, 460 U.S. at 12-13. In contrast to orders "as to which some revision might reasonably be

expected in the ordinary course of litigation," the first requirement of the collateral order doctrine is satisfied by orders "made with the expectation that they will be the final word on the subject addressed." *Id.* at 12 n.14.

Although a remand to state court also seems to satisfy both the *Idlewild* and *Cohen* tests for finality, *Moses H. Cone* did not purport to overrule *Thermtron*. As a result, when, in *Survival Systems*, we first confronted a remand of a supplemental state law claim, we held that "[t]he only avenue of review available is by mandamus under the authority of *Thermtron*." 825 F.2d at 1418. Notwithstanding the latent conflict between *Survival Systems* and *Moses H. Cone*, our cases continually held that remands preceded by discretionary declines of jurisdiction over state law claims could be reviewed only by way of a mandamus petition. *See Executive Software N. Am.*, 24 F.3d at 1550; *Lee*, 12 F.2d at 936; *Price v. PSA, Inc.*, 829 F.2d 871, 874 (9th Cir. 1987); *Paige v. Henry J. Kaiser Co.*, 826 F.2d 857, 865-66 (9th Cir. 1987). *But see Scott v. Machinists Auto. Trades Dist. Lodge No. 190 of N. Cal.*, 827 F.2d 589, 592 (9th Cir. 1987) (per curiam) (reviewing in an ordinary appeal a remand that followed a discretionary decline of supplemental jurisdiction).

Ordinarily, we would be bound by *Survival Systems*, and the task of correcting any perceived errors would fall to an en banc panel of this court. An exception to this rule occurs, however, when an intervening Supreme Court decision "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900. This is true even when the intervening case dealt with an issue that is not identical to the one presented in the circuit precedent. *Id.*

**[6]** The reasoning in *Quackenbush* convinces us that *Survival Systems* and its progeny are no longer good law. In *Quackenbush*, the Supreme Court considered whether an abstention-based remand is appealable under § 1291. 517 U.S.

at 709. Comparing such a remand to the stay at issue in *Moses H. Cone*, the Court had little difficulty finding it appealable. More so than the stay reviewed in *Moses H. Cone*, the remand placed the litigants "effectively out of court"—the *Idlewild* rationale. *Id.* at 714 ("When a district court remands a case to a state court, the district court disassociates itself from the case entirely, retaining nothing of the matter on the federal court's docket."). The abstention-based remand also satisfied the *Cohen* test for finality; it conclusively determined an issue separate from the merits, it was sufficiently important to warrant an immediate appeal, and it would not be subsumed in any other appealable order. *Id.*

Because the Court was reviewing a remand, the conflict between *Moses H. Cone* and *Thermtron* was manifest. Rather than attempt to reconcile the two cases, the Court held that "[t]o the extent *Thermtron* would require us to ignore the implications of our later holding in *Moses H. Cone*, . . . we disavow it." *Quackenbush*, 517 U.S. at 715.

This overruling of *Thermtron* effectively destroys the foundation for *Survival Systems*. When *Survival Systems* ruled that a mandamus petition was required for review of a discretionary decision to remand a pendent state law claim, it cited the "authority of *Thermtron*." 825 F.2d at 1418; *accord Price*, 829 F.2d at 874 (rejecting the analysis used in *Moses H. Cone because, "under Thermtron*, the order is reviewable on a petition for a writ of mandamus"). In *Lee v. City of Beaumont*, we described the *Moses H. Cone* analysis as "an exception" to the *Thermtron* rule. 12 F.3d at 935. It is now clear, though, that *Moses H. Cone* did not supplement *Thermtron*; it supplanted it.

Although *Survival Systems* has not yet been explicitly overruled, we have already recognized that "[t]he Supreme Court's decision in *Quackenbush* refined and expanded our test for determining whether an exceptional remand order is reviewable on appeal." *Snodgrass*, 147 F.3d at 1165. In a case

of first impression, *Snodgrass* held that a remand under the Declaratory Judgment Act, 28 U.S.C. § 2201, is reviewable under § 1291. In doing so, it rejected *Survival Systems*' analysis in favor of *Moses H. Cone's Idlewild* and *Cohen* tests.[7]

[7] We now recognize that *Quackenbush* is clearly irreconcilable with *Survival Systems* and its progeny. *Cf. In re Bethesda Mem. Hosp., Inc.*, 123 F.3d 1407, 1408 (11th Cir. 1997) ("*Quackebush* . . . overrules this circuit's cases holding that mandamus is the proper vehicle to review remand orders."); *Pa. Nurses Ass'n v. Pa. State Educ. Ass'n*, 90 F.3d 797, 801 (3rd Cir. 1996) (stating that *Quackenbush* supports view that remands under § 1367(c) are reviewable under § 1291); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996) (holding that district court's remand

---

[7]We have found only two published decisions in this circuit that have applied the jurisdictional/substantive test, *see supra* note 5, since *Quackenbush* was decided. *Niehaus v. Greyhound Lines, Inc.* cited *Lee* and repeated that "when a remand order is based on a substantive determination of the merits, the order is reviewable on appeal as a final collateral order." 173 F.3d 1207, 1211 (9th Cir. 1999). But *Niehaus* had no occasion to revisit *Survival Systems* and *Lee*. In a single paragraph of jurisdictional analysis, *Niehaus* found that the remand order before it was based on a substantive decision and was therefore reviewable under § 1291. Thus, the outcome of the § 1291 analysis would have been the same whether or not the jurisdictional/substantive test remained in force.

In *Lyons v. Alaska Teamsters Employer Service Corp.*, we discussed at some length the jurisdictional/substantive test. 188 F.3d 1170, 1172-73 (9th Cir. 1999). *Lyons*, though, considered the distinction as part of the § 1447(d) analysis. The court never reached the mandamus issue because it concluded that the district court's "substantive preemption analysis was part of the jurisdictional determination," and the court of appeals, therefore, "lack[ed] jurisdiction to review the remand order pursuant to 28 U.S.C. § 1447(d)." *Id.* at 1174.

We have not found any case decided after *Quackenbush* in which this court confronted a remand to state court and rejected a § 1291 appeal in favor of a mandamus petition under the authority of *Survival Systems* or related cases. Thus, we consider *Quackenbush* to be "intervening" within the meaning of our stare decisis jurisprudence.

under § 1367(c) was reviewable under § 1291 because remand's effect was "identical to that of the order reviewed in *Quackenbush*," notwithstanding earlier circuit case law that indicated mandamus petition was the proper procedure). We conclude that *Moses H. Cone* should guide our review of remands to state court, and, on the authority of *Quackenbush*, we overrule circuit precedents that instruct otherwise.

**[8]** Applying *Moses H. Cone* to this case, we find that we have jurisdiction under § 1291 to review the remand order. The *Idlewild* "effectively out of court" test is satisfied because " 'the district court disassociate[d] itself from the case entirely, retaining nothing of the matter on the federal court's docket.' " *Snodgrass*, 147 F.3d at 1166 (quoting *Quackenbush*, 517 U.S. at 714).

**[9]** The remand also qualifies as an appealable collateral order under *Cohen*. By holding that the factors identified in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), cut against an exercise of supplemental jurisdiction, the district court "conclusively determined a disputed question completely separate from the merits." *Snodgrass*, 147 F.3d at 1166. That decision "could not be reviewed on appeal from the final judgment ultimately entered by the state court." *Id.*

**[10]** Additionally, the Supreme Court has recently explained that the collateral order doctrine can be invoked only to advance a "weighty public objective" that is sufficient to overcome "the substantial finality interests § 1291 is meant to further." *Will v. Hallock*, 546 U.S. 345, 350, 353 (2006). For example, a district court's decision denying a state's claim of Eleventh Amendment immunity is an appealable collateral order because of the "need to ensure vindication of a State's dignitary interests." *Id.* at 352 (citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). The public interest in promoting foreign relations is substantial enough to give this court collateral-order jurisdic-

tion over a district court's decision denying a party's claim for FSIA's procedural protections. *See, e.g.*, *Gupta v. Thai Airways Int'l, Ltd.*, 487 F.3d 759, 763-64 & n.6 (9th Cir. 2007) (noting that orders denying foreign sovereign immunity are collateral orders and that "the text of the FSIA and the legislative history of the Act 'support[ ] a prompt appellate determination of sovereign immunity' " (quoting *Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Ct.*, 859 F.2d 1354, 1358 (9th Cir. 1988) (per curiam))).

We proceed to the merits of the dispute under § 1291 standards.

## III.   FSIA

[11] Congress has granted procedural and substantive protections to foreign sovereigns and entities with certain relationships to them. Procedurally, "foreign state[s]," as defined by 28 U.S.C. § 1603(a), are empowered to remove civil actions brought against them to federal court for a bench trial. 28 U.S.C. § 1441(d).[8] Substantively, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," unless it falls within certain exceptions. 28 U.S.C. § 1604.

[12] Because this action concerns contracts between DWR and Powerex, Powerex concedes that this case falls within the "commercial activity" exception to substantive immunity. *See* 28 U.S.C. § 1605(a)(2). Powerex maintains, though, that it is entitled to a bench trial in federal court because it falls within the definition of "foreign state" in § 1603(a) and (b).

---

[8]In relevant part, § 1441(d) states,

Any civil action brought in a State court against a foreign state as defined in [28 U.S.C. § 1603(a)] may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury.

**[13]** Section 1603(a) includes within the definition of "foreign state" a "political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in [§ 1603(b)]." Section 1603(b) provides that

> An "agency or instrumentality of a foreign state" means any entity—
>
> > (1) which is a separate legal person, corporate or otherwise, and
> >
> > (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> >
> > (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

**[14]** There is no dispute that Powerex satisfies the § 1603(b)(1) and (3) definitional requirements of "agency or instrumentality of a foreign state." Rather, this case turns on whether Powerex is an "organ" of either Canada or a Canadian political subdivision.[9]

As noted at the outset, in *California v. NRG Energy Inc.*, we held that Powerex was not an organ of British Columbia (sometimes, "the Province"). 391 F.3d 1011, 1025-26 (9th Cir. 2004), *vacated sub nom. Powerex Corp. v. Reliant*

---

[9]Powerex contends that it is an organ of British Columbia *and* that a majority of its shares are owned by British Columbia. Because we hold that Powerex passed the organ test, we need not reach its majority-of-shares argument. *See EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 639 (9th Cir. 2003) (noting that "organ" and "majority of shares" prongs are disjunctive).

*Energy Servs., Inc.*, 127 S. Ct. 2411 (2007). Because that decision was vacated on jurisdictional grounds by the Supreme Court, however, we are not bound by it, and we accord that opinion deference only to the extent we find it persuasive. *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 804 n.15 (9th Cir. 2007). We can also consider the persuasive force of Justice Breyer's dissent in *Powerex*. Whereas the *Powerex* majority never reached the FSIA question, finding that it lacked the jurisdiction to do so, Justice Breyer would have held that the Court had jurisdiction and that Powerex is an organ of the Province. *See Powerex*, 127 S. Ct. at 2424-26 (Breyer, J., joined by Stevens, J., dissenting).

**[15]** An entity is an organ of a foreign state (or political subdivision thereof) if it "engages in a public activity on behalf of the foreign government." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001), *aff'd on other grounds*, 538 U.S. 468 (2003). To determine whether an entity satisfies this definitional test,

> "courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." An entity may be an organ of a foreign state even if it has some autonomy from the foreign government.

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003) (citations omitted) (quoting *Patrickson*, 251 F.3d at 807). Consistent with Congress's intent, this court defines "organ" "broadly," mindful that

> " 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel com-

pany, a central bank, an export association, a government procurement agency or a department or ministry which acts and is suable in its own name."

*Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995) (quoting H.R. Rep. No. 94-1487 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6614).

**[16]** Powerex's relationship with British Columbia cannot be fully understood without first examining Powerex's parent company, BC Hydro. In 1964, BC Hydro was created by the British Columbia Hydro and Power Authority Act in order to hold the Province's assets and to promote major hydroelectric development. Its responsibilities included, for example, building dams and power-related facilities along the Peace River system.

Early in its existence, BC Hydro assisted the Province and Canada in negotiating and implementing a treaty pertaining to power generation and flood control along the Columbia River. *See* Treaty Between the United States of America and Canada Relating to Cooperative Development of the Water Resources of the Columbia River Basin, U.S.-Can., Jan. 22-Sep. 16, 1964, 15 U.S.T. 1555 [hereinafter Columbia River Treaty]. The Columbia River Treaty contained a provision in which both Canada and the United States agreed to "designate entities . . . empowered and charged with the duty to formulate and carry out the operating arrangements necessary to implement the Treaty." *Id.*, art. XIV, § 1, 15 U.S.T. at 1566. BC Hydro was duly designated as such, and was tasked with, among other things, constructing reservoir facilities on the Columbia River. During the 1980s, the corporation actively sold power to United States entities at the international border.

BC Hydro is governed by British Columbia's Hydro and Power Authority Act. R.S.B.C., ch. 212, § 1(1) (1996). By that legislation, the corporation is "for all its purposes an

agent of the government and its powers may be exercised only as an agent of the government." *Id.* § 3(1). BC Hydro directors are appointed by, and hold office during the pleasure of, the Lieutenant Governor in Council,[10] who also determines their salaries and other remuneration. *Id.* § 4(1), (3). The powers vested in the corporation by the legislation are "[s]ubject to the approval of the Lieutenant Governor in Council." *Id.* § 12(1).

In *NRG Energy*, we concluded that "BC Hydro was an immune foreign sovereign as defined by the Foreign Sovereign Immunities Act," and that the decisions it made relating to the energy crisis in 2000-2001 were "sovereign functions, not commercial ones." 391 F.3d at 1024. We explained that "BC Hydro is responsible for decisions relating to, for example, flood control, management of fisheries, and construction of dams. These are governmental responsibilities, unlike any responsibilities of a private, commercial actor." *Id.*

---

[10]Who is the Lieutenant Governor in Council? According to the website of British Columbia's current Lieutenant Governor,

> "Lieutenant Governor" is The Queen's representative and CEO of the province. . . . The Queen is the Head of the Commonwealth and the Canadian Head of State, thus The Queen of Canada. The Lieutenant Governor is appointed by the Governor General, on the advice of the Prime Minister of Canada, for a period of not less than five years.
>
> . . . .
>
> "Lieutenant Governor in Council" appears in many government documents, such as acts of legislation. Legally, it refers to the Lieutenant Governor acting on and with the advice of the Executive Council or Cabinet. When the Cabinet makes a decision and it has been approved by the Lieutenant Governor, it is said to have been made by the Lieutenant Governor in Council.

*See* Office of the Lieutenant Governor, Frequently Asked Questions: What is the difference between "Lieutenant Governor" and "Lieutenant Governor in Council"?, http://www.ltgov.bc.ca/faq/default.htm#difference (last visited June 20, 2008).

Having familiarized ourselves with BC Hydro, we can now turn our focus to Powerex.

In November 1988, British Columbia's Minister of Energy, Mines, and Petroleum Resources notified BC Hydro's CEO and Chairman that the Provincial Cabinet desired a "single window agency to be responsible to market the export of power outside the province and that this entity should be a wholly owned subsidiary of BC Hydro." Powerex (under a different name) was incorporated one month later.

BC Hydro wholly owns Powerex and appoints Powerex's board of directors. That board is made up of inside directors who sit on both BC Hydro's and Powerex's boards, and outside directors who are appointed by the inside directors. Any outside directors—i.e., non-BC Hydro directors—on Powerex's board are subject to the approval of the office of the British Columbia Premier.

[17] The "circumstances surrounding [Powerex's] creation" weigh in favor of finding Powerex an organ of British Columbia.[11] It owes its very existence to the Province, which instructed BC Hydro to establish a subsidiary that would assist it with its sovereign functions. BC Hydro did not contract with an outside, private company; pursuant to the Province minister's instructions, it created an "agency" that qualifies as a "government body" under the Province's fiscal control statute. *See Powerex*, 127 S. Ct. at 2425 (Breyer, J., dissenting) (citing Financial Administration Act, R.S.B.C. ch.

---

[11]One reason we may reach a different outcome than the *NRG Energy* court is because we believe these circumstances are relevant, whereas *NRG Energy* appears to have given them no consideration. *See NRG Energy*, 391 F.3d at 1025-26. We choose to follow other cases that have recognized the significance of the circumstances surrounding an entity's creation, and that have relied upon them in finding that entities qualified as organs. *See, e.g., EIE Guam*, 322 F.3d at 640, 642; *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 653-55 (9th Cir. 1996).

138, § 1 (1996)). *But cf. Patrickson*, 251 F.3d at 808 (rejecting corporations' claim of organ status under FSIA, even though foreign state's law classified corporations as "government companies"). DWR points out that Powerex was not legislatively created. Creation by formal legislation, however, is not a precondition for recognition as an organ of a foreign state under FSIA. *See EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 995, 998 (9th Cir. 2001) (remanding to district court for further factfinding on organ status of entity, even though entity was a private insurance company *purchased* by foreign state); *Gates*, 54 F.3d at 1460 (holding that an association of private hog producers was an organ, where such association became an official industry marketing board pursuant to Alberta law after receiving approval from Alberta government).

"[T]the purpose of [Powerex's] activities," also reveals the entity's public nature. Since its incorporation in 1988, Powerex has been marketing surplus power from the BC Hydro system. Powerex receives power from BC Hydro at the Province's border, and then sells it wholesale to entities in Canada and the United States. Although there is nothing inherently public about this type of activity, in this case Powerex is fulfilling the precise mission originally dictated by the Province's Ministry of Energy, Mines, and Petroleum Resources.

The Province has also looked to Powerex to further other public policies. Under the direction of the Provincial Government, Powerex fulfills the goals of the Power for Jobs Development Act, the purpose of which is "to help ensure that British Columbia's electric power resources contribute to the creation and retention of jobs in British Columbia and to regional economic development." Power for Jobs Development Act, S.B.C. ch. 51, § 2 (1997); *id.* § 1 (defining "authority" as BC Hydro and "a subsidiary of the British Columbia Hydro and Power Authority"). In furtherance of that Act, Powerex has supplied power on favorable terms to expanding

businesses in British Columbia, and negotiated on behalf of the Province with "industrial undertakings" that have considered establishing facilities in the Province.

Powerex has also played a role in treaty formation and implementation. *See Powerex*, 127 S. Ct. at 2425 (Breyer, J., dissenting) (citing agreements). For example, its executives negotiated, and then the corporation assumed, some of Canada's rights and interests under the Columbia River Treaty in the 1990s. Finally, Powerex was to serve as the vehicle for the Province's now-abandoned attempt to create an auction market for electricity trading. All of these activities were in furtherance of policies adopted by the *Province*, and thus they were activities pursued for "public" purposes. *See EIE Guam*, 322 F.3d at 640-42 (finding that "key" fact to entity's organ status was that entity's "purpose is to carry out Japanese national policy" (internal quotation marks omitted)); *Gates*, 54 F.3d at 1461 (holding that entity is organ, and explaining that the "conclusion is especially sound here given that the purpose of the entity in question is to advance the Province of Alberta's interest").

Turning to the next factor, we respectfully disagree with the *NRG Energy* court's finding that Powerex enjoys a "high degree of independence from the government." 391 F.3d at 1026. On the contrary, Powerex is restrained by provincial regulations and directives applicable to government corporations, the Province can limit Powerex's ability to enter banking and other financial arrangements, and Powerex's financial operations are reviewed by the Province's comptroller general.[12] *Powerex*, 127 S. Ct. at 2425 (Breyer, J., dissenting) (citing Financial Administration Act, R.S.B.C. ch. 138, §§ 4.1, 8(2)(c)(i), 75, 79.3 (1996)).

---

[12]Br. for the Province of British Columbia as Amicus Curiae Supporting Appellant at 24.

Most importantly, "[t]he British Columbian Government, through BC Hydro, has sole beneficial ownership and control of Powerex." *Id.* at 2426. As noted above, the Province sets Powerex's objectives and indirectly appoints and approves its board members to ensure that Powerex carries out its public duties. Although Powerex may enjoy a limited degree of tactical independence, its purposes and strategies—indeed, its continued existence—are determined by the Province.

DWR argues that it is BC Hydro, and not the Province, that directly supervises Powerex. This hardly matters. If BC Hydro conducts sovereign functions as an agent of the Province, there is no obvious reason why it is significant that Powerex reports to BC Hydro, so long as Powerex's relationship to the Province otherwise satisfies FSIA's criteria. There is no reason to think Congress cared for the *manner* in which foreign states interacted with their organs—i.e., whether the foreign state supervises the organ directly, or through an incorporated agent. *See Gates*, 54 F.3d at 1460 (holding that entity was organ, because even though government did "not appear to exercise day-to-day control over [the entity, the government did] play an active supervisory role"). In any event, this circuit has already rejected this line of argument with respect to a second-tier subsidiary of the government of Mexico. *Corporacion Mexicana de Servicios Maritimos*, 89 F.3d at 655.

Discussing some of the remaining factors in this circuit's test for determining "organ" status, *NRG Energy* observed Powerex's "lack of financial support from the government and its lack of special privileges or obligations under Canadian law." 391 F.3d at 1026.

Again, we take a different view. Notably, Powerex does not pay federal or provincial income tax. This is a special privilege under Canadian law, and it likely amounts to substantial financial support. And we have already discussed other obligations under the Province's laws—Powerex's role in imple-

menting treaties and assisting the Province with its job-creation efforts, as well as its duty to comply with sundry regulations that apply to government corporations.

*NRG Energy* noted the district court's finding that "Powerex acted not in the public interest, but rather as an independent commercial enterprise pursuing its own profits," and that "any profits and losses from [Powerex's] sales of power are solely the responsibility of PowerEx and are in no way guaranteed or subsidized by the government." 391 F.3d at 1026.

According to the evidence before this court, Powerex does not reap its profits. BC Hydro's treasurer declared:

> Powerex's earnings are consolidated with those of BC Hydro for purposes of establishing BC Hydro's rates. . . . The benefits of Powerex's export trade activity are passed through to the Provincial Government through the consolidation of Powerex's earnings into the net income of BC Hydro and the requirement that, whenever its debt equity ratio would not drop below certain specified levels, BC Hydro pay approximately 85% of its consolidated net income to the BC Government annually.[13]

In other words, "if Powerex earns a profit, that profit must be rebated directly or indirectly to British Columbia's residents." *Powerex*, 127 S. Ct. at 2426 (Breyer, J., dissenting).

For this reason, it is irrelevant that Powerex is profit-driven, for, as Justice Breyer explained,

> a well-run nationalized firm *should* make a reasonable profit; nor should it have to borrow from the

---

[13]Decl. of Valerie Lambert in Support of British Columbia Hydro and Power Authority's Motion to Dismiss ¶ 6.

> government itself. The relevant question is not *whether* Powerex earns a profit but where does that profit go? Here it does not go to private shareholders; it goes to the benefit of the public in payments to the province and reduced electricity prices.

*Powerex*, 127 S. Ct. at 2426 (Breyer, J., dissenting) (citations omitted); *see also EIE Guam*, 322 F.3d at 641 (holding that entity is organ, notwithstanding "the commercial nature" of its work, because of "Congress' belief that an entity's involvement in commercial affairs does not automatically render the entity non-governmental" (internal quotation marks omitted)).

Powerex's employment policies do not obviously qualify it or disqualify it as an "organ" of British Columbia. Although Powerex employees are not civil servants and are not paid within provincial guidelines nor included in the government pension program, this court has repeatedly held that "[a] company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants." *EIE Guam*, 322 F.3d at 641 (citing *Gates*, 54 F.3d at 1461). Further, Powerex employees enjoy the same standard employee benefits as BC Hydro employees and participate in the same pension plan, and it seems pretty clear that BC Hydro would qualify as an "organ."

**[18]** Taking a holistic view of Powerex, one sees a corporation that is a wholly-owned, second-tier subsidiary of British Columbia, created pursuant to an order of the Province. A majority of its directors are indirectly selected by the Lieutenant Governor in Council, and its remaining directors are subject to government approval. It is immune from taxation. By statute, the government's comptroller oversees its financial operations. It implements international agreements at the direction of the government, and it carries out domestic policy goals. Its profits redound to the benefit of the Province's citizens. For these reasons, we agree with Justice Breyer that

"Powerex is the kind of government entity that Congress had in mind when it wrote the FSIA's 'commercial activit[y]' provisions." *Powerex*, 127 S. Ct. at 2426 (Breyer, J., dissenting) (alteration in original) (quoting 28 U.S.C. § 1602).

## IV.    Conclusion

**[19]** Because we hold that Powerex is an organ of British Columbia, it falls within the definition of "foreign state" and is entitled to a federal bench trial. *See* 28 U.S.C. §§ 1441(d), 1603. We express no opinion on the Federal Power Act issue.

**REVERSED and REMANDED.**